USCA1 Opinion

 

 October 4, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ___________________ No. 92-2342 JOHN P. MURRAY, ET AL., Plaintiffs, Appellants, v. ROSS-DOVE COMPANY, INC. AND DOVETECH, INC., Defendants, Appellees. __________________ ERRATA SHEET The opinion of this Court issued on September 27, 1993, is amended as follows: On page 12, last line of footnote 5, replace "continual" with "continued". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2342 JOHN P. MURRAY, ET AL., Plaintiffs, Appellants, v. ROSS-DOVE COMPANY, INC. AND DOVETECH, INC., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Feinberg,* Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Robert M. Duffy with whom Michael P. DeFanti and Hinckley, Allen _______________ ___________________ ________________ & Snyder were on brief for appellants. ________ Michael B. Waitzkin with whom Eric L. Lewis, Rima Sirota, _____________________ _______________ ____________ Nussbaum & Wald, Marc C. Hadden and Gidley, Sarli & Marusak were on ________________ ______________ ________________________ brief for appellees. ____________________ September 27, 1993 ____________________ ____________________________ *Of the Second Circuit, sitting by designation. BOUDIN, Circuit Judge. This is an appeal from a ______________ decision of the district court withdrawing from the jury a commercial dispute at the end of the plaintiffs' case. Although we think that the plaintiffs' evidence failed to show fraud and we treat an aiding and abetting claim as abandoned, the evidence of negligence and injury was in our view just adequate to foreclose a directed verdict. Accordingly, we affirm the ruling as to the fraud claim but vacate the judgment as to the negligence claims and remand for further proceedings, strongly encouraging the parties to explore settlement of this case. I. BACKGROUND Plaintiffs are three individuals, Franklin D. Crawford, John P. Murray, Jr. and J. Michael Murray, known collectively as "the Crawford Group," and an associated investment entity, Bevmar Acquisition Corp. Defendants are Ross-Dove Company, Inc., a commercial auction firm, and Dovetech, a division of Ross-Dove (which may well not be a suable entity). The dispute arises out of an appraisal done by Ross-Dove of certain assets of Bevmar, Inc. ("Bevmar"), a California corporation formerly engaged in the manufacture and sale of electronic circuitry panels. In 1989, one Robert H. Marik, an acquaintance of Crawford, organized Bevmar Acquisition Corp. as part of an effort to solicit investments in Bevmar. In aid of that -2- -2- effort, an investment banker working with Marik engaged Dovetech to appraise certain of Bevmar's assets. Dovetech's appraisal was conducted by Bruce Schneider, with help from other employees, and was completed in June 1989. That appraisal valued Bevmar's machinery, equipment, molds and dies at three different values, ranging from over $2 million total to over $6 million depending on the circumstances of sale. The appraisal said that the appraised value of molds and dies should not decline for at least three years. In September 1989, Marik invited Crawford to invest in Bevmar, through the Bevmar Acquisition Corp., and Marik made the Dovetech appraisal of Bevmar's assets available to Crawford. Crawford contacted Schneider to explain his interest in Bevmar and to determine the status of the Dovetech appraisal. Schneider assured Crawford that the appraisal was still valid. In October 1989 Crawford, together with the two Murrays, paid $3 million for a stake in Bevmar comprising a loan to Bevmar to be repaid at 20 percent annual interest, a 40 percent equity interest in the company, and a bonus depending on the fortunes of the company. To secure the loan, Bevmar gave the Crawford group a security interest in all of its machinery, equipment, molds and dies. There were some discrepancies between items listed in the Dovetech appraisal and items listed in the recorded security filings, but the latter lists were delayed and the -3- -3- discrepancies not immediately noticed. What did become rapidly apparent was that Bevmar was in deep trouble. Crawford invested a further $500,000 but in March 1990 a chapter 7 petition was filed and Bevmar entered bankruptcy. When its assets were liquidated, the amount realized on the machinery, equipment, molds and dies was about $453,000. The plaintiffs then commenced this suit in the district court charging Ross-Dove and Dovetech with negligence, negligent misrepresentation, fraud, and aiding and abetting the torts of others.1 Actual damages in the amount of $4.5 million were sought, as well as punitive or exemplary damages. The gist of the complaint was that Dovetech had carelessly or dishonestly overestimated the value of the assets it had appraised in June 1989 and that the Crawford group had relied to its detriment on that appraisal in investing in Bevmar. After discovery, a four-day jury trial occurred in September 1992. Plaintiffs offered testimony from a number of witnesses, either in person or by deposition, including the three Crawford group members, Schneider, two Bevmar employees, an employee of the company that purchased the molds and dies after Bevmar's bankruptcy, and an appraiser who had appraised Bevmar machinery and equipment and given a ____________________ 1The last of these claims is not discussed in the plaintiffs' brief on appeal, there is scant evidence to support such a claim, and we treat it as abandoned. -4- -4- general opinion about the value of its molds and dies in March 1989. Surprisingly, plaintiffs did not provide an expert witness to testify as to the inadequacy or incompetence of Dovetech's appraisal.2 At the close of plaintiffs' case, defendants sought judgment as a matter of law under Fed. R. Civ. P. 50(a)(1), the current name of the traditional relief afforded by a directed verdict. On October 1, 1992, the district court delivered a detailed oral opinion concluding that plaintiffs had failed to show that the appraisal was inaccurate or that defendants were at fault. Alternatively, the court found failures of proof as to justifiable reliance on the appraisal and as to causation of injury. Although we regard this case as a close call, on balance we think that plaintiffs did at the completion of their opening case have enough evidence to reach a jury on a negligence theory. II. ANALYSIS On a Rule 50(a) motion, appellate review is plenary. American Private Line Serv., Inc. v. Eastern Microwave, Inc., _________________________________ _______________________ 980 F.2d 33, 35 (1st Cir. 1992). The evidence and inferences from it are considered in the light most favorable to the ____________________ 2Plaintiffs belatedly attempted to add an expert witness but this was disallowed because the witness was not timely listed as required by pretrial orders. Plaintiffs complain but we see no error in this ruling. The district court did allow plaintiff to make use of deposition testimony of Steve Piletz, an expert appraiser who had appraised certain of the assets in March 1989. -5- -5- party opposing the directed verdict, here, the plaintiffs. Raymond Steel, Inc. v. Puerto Rican American Ins. Co., 954 ____________________ ______________________________ F.2d 19, 22 (1st Cir. 1992). A directed verdict is proper at the close of plaintiffs' case only when the plaintiffs' evidence, viewed in this light, would not permit a reasonable jury to find in favor of the plaintiffs on any permissible claim or theory. A reviewing court must thus ask whether the plaintiffs have offered enough evidence to permit findings in plaintiffs' favor on each of the elements necessary to prove ____ at least one cause of action. Here, the parties have assumed that Rhode Island law defines the causes of action--why is not clear--and we accept this premise. See In re Newport ___ ______________ Plaza Associates, L.P., 985 F.2d 640, 644 (1st Cir. 1993). _______________________ It also appears to be common ground that, under Rhode Island law, a cause of action for negligence or negligent misrepresentation exists if the Dovetech appraisal was inaccurate, the inaccuracy stemmed from negligence, reliance on the appraisal was justified, and the reliance proximately -6- -6- resulted in injury.3 With this yardstick, we turn to the evidence. ____________________ 3Because plaintiffs' claims of negligence and negligent misrepresentation both allege negligent supply of false information, we will consider them as the same claim. See ___ Ralston Dry-Wall Co., Inc. v. United States Gypsum Co., 740 ___________________________ ________________________ F. Supp. 926, 932 (D.R.I. 1990), aff'd, 926 F.2d 99 (1st Cir. _____ 1991). The Rhode Island Supreme Court has not yet directly addressed a cause of action for negligent misrepresentation, Ostalkiewicz v. Guardian Alarm, 520 A.2d 563, 569 (R.I. ____________ ______________ 1987), but federal courts applying Rhode Island law have held that negligent misrepresentation is actionable. E.g., Banco ____ _____ Totta e Acores v. Fleet Nat'l Bank, 768 F. Supp. 943, 946-47 ______________ ________________ (D.R.I. 1991); Ralston Dry-Wall Company, Inc., 740 F. Supp. ______________________________ at 932. -7- -7- A. Inaccuracy and Fault ____________________ The first two elements, inaccuracy in the appraisal and negligence in its preparation, are closely related and need to be considered together. In the abstract, an appraisal could be inaccurate without fault, or it could be carelessly prepared but correct in its conclusion. But in this case, as in many, the issues overlap because if inaccuracy is shown, the magnitude of the inaccuracy may be some evidence of negligence. How strong the inference would be depends, as usual, on the facts. Here, plaintiffs' best case for error in the appraisal and for negligence, stripped to its essentials, can be easily summarized. First and most important, plaintiffs offered evidence of a gross disparity between the appraisals of value assigned by Dovetech to the Bevmar molds and dies in June 1989 and the value realized for the Bevmar molds and dies about a year later. In the Dovetech appraisal, the molds and dies were evaluated as follows: AUCTION: $16,000 x 96 = $1,536,000 ORDERLY: $21,000 x 96 = $2,016,000 IN PLACE: $42,000 x 96 = $4,032,000 According to the appraisal, "auction" meant disposition "as is" at an auction sale completed in a 30-40 day time frame; "orderly" meant orderly liquidation over a maximum of six months; and "in place" meant as part of an ongoing enterprise. -8- -8- When the 96 molds and dies were auctioned as a lot in July 1990, the winning bid was $40,000 for the whole lot and was made by Elcor Corporation, which had sold 96 molds and dies to Bevmar in 1986. When its representative arrived to collect the molds and dies, he found some to be in poor condition and others to be incomplete, missing or claimed by another company. Thus the plaintiffs' starting point was their proof (subject to reservations yet to be discussed) that molds and dies appraised at a minimum price of $1.5 million in 1989 had sold for less than 3 percent of the this figure a year later. There was far less of a disparity as to the machinery and equipment; the minimum estimate provided by Dovetech was around $676,000 and the auctions of these items returned about $413,000. The district court, after evaluating the gap between the appraisal and the realized price for the machinery and equipment found no proof of material inaccuracy at all. But the molds and dies represented about two-thirds of the total value attributed by Dovetech to machinery, equipment, molds and dies. A serious error in their appraisal could by itself easily be an adequate basis for finding the appraisal to be materially in error. The disparity in the price predicted and the price realized for the molds and dies is hardly conclusive. The auction might not have been fair, although there is no -9- -9- suggestion of that in this record. Or conditions might have changed so materially that no negligence could be imputed based on the disparity; in this instance, Crawford testified briefly that market conditions had if anything improved. But a very large and unexplained disparity offers a prima facie case of error in the appraisal and at least some evidence of negligence. Whether the huge disparity here would be sufficient evidence of negligence need not be decided, because there was further evidence that cast an unfavorable light on the appraisal. All of the Bevmar molds and dies were located at Bevmar's California plant or at about eight other locations where they were held by Bevmar subcontractors to make products for Bevmar. Schneider testified that he visited each of the nine locations in making his appraisal and then consulted by telephone with subcontractors and others as to what they would pay if the molds and dies were sold. But Elcor's representative testified that after Elcor won the bid a year later, he visited each of the nine locations and found many of the items in poor condition, in some cases even unusable. And a Bevmar employee testified that Schneider had visited only three of the subcontractors when doing his appraisal, had not even examined all the molds and dies at these three stops, and had been told that some items were missing. There was testimony that the molds and -10- -10- dies were different and in different condition. Against this background, a jury could have regarded Schneider's assignment of a uniform figure to each of the 96 molds and dies (e.g., ____ $16,000 apiece if auctioned) as highly suspicious and as further evidence that Schneider had done a sloppy appraisal. The deposition testimony of Schneider could also have reinforced a jury's judgment that the appraisal was negligent. His expert credentials were fairly thin but, far worse, portions of his deposition transcript read to the jury were littered with the entry "no response" when he was pressed on the puzzling uniformity of figures and related matters. There was no real evidence of fraud or of aiding and abetting fraud, and we do not fault the trial court in withdrawing this issue from the jury. Yet at least some of the evidence that plaintiffs associate with fraud could have further undermined the jury's confidence in Schneider's skill and care.4 We think that the evidence recited would permit a reasonable jury to conclude that Schneider's appraisal of the molds and dies was erroneous in the sense that it was not a ____________________ 4Schneider relied in appraising the machinery and equipment located on the East Coast on photographs sent to him by a Dovetech employee based in Massachusetts. He apparently knew that Marik was seeking a high appraisal figure. And he was associated, although the evidence was somewhat confused, with a possible proposal in September 1989 for Ross-Dove itself to offer $500,000 to Bevmar for all of the items in question, the same month in which he assured Crawford that the June 1989 appraisal was still valid. -11- -11- responsible estimate of value and, further, to conclude that its preparation was negligent. A jury might not so find, and a strong defense case might make such findings less likely or even impossible. Still, limiting ourselves to the evidence as it stood at the close of plaintiffs' case, and resolving inferences and issue of credibility in favor of the plaintiffs, we think that a jury that found error and negligence in the appraisal would not be irrational. We turn now to the district court's discussion of the molds and dies, a subject that the court fairly described as difficult and to which it gave careful attention. The court gave three reasons for disregarding the discrepancy between appraisal and realized value. The first was that Schneider's appraisal was based on the market value of the items as functioning molds and dies whereas the molds and dies were (in the district court's words) "apparently sold at auction as scrap," some being operational and some not. This, said the court, made a comparison between predicted and realized price of the items a comparison of apples and oranges. With respect, we think it might be more accurate to say that Schneider appraised the molds and dies as apples but they, or some of them, turned out to be oranges. It is not clear what knowledge Elcor had of the molds and dies before the auction. The molds and dies seem to have been advertised for auction as operational, since pictures of the items they -12- -12- could produce were offered. Having sold 96 molds and dies to Bevmar in 1986, Elcor may have supposed that it already knew what it was getting. At the same time, Elcor's bid was certainly very low and may be open to the inference that Elcor knew that many of the items were scrap or little more. No doubt, as the district court assumed, it is implicit in Schneider's estimate of $1.5 million that the molds and dies would be bought for use, for $1.5 million is obviously above scrap value.5 But by the same token it is also implicit in the appraisal that they were capable of such use and would normally be so employed, absent a major change in market conditions or in the items themselves. Yet there is no evidence that market conditions had changed by July 1990 or that the items themselves had unexpectedly deteriorated. In sum, a jury could condemn Schneider for appraising the _____________________________________________________________ molds and dies as useful when in fact they were largely _____________________________________________________________ scrap. _____ Second, the district court observed that the buyer of the molds and dies at the auction got only 20 to 40 of the molds and dies. The court found these to be "a far cry" from the 96 that were appraised by Dovetech, the more so because the court said that the more valuable ones were excluded. ____________________ 5Piletz, who appraised Bevmar's machinery and equipment in March 1989, offered an informed guess based on reproduction value--not an appraisal--that the molds and dies "might" sell for about $158,000 if sold as scrap and $634,000 if sold for continued use. -13- -13- The court evidently believed that the discrepancy in appraisal and price might have been explained by the fact that Dovetech was appraising a more extensive and valuable collection of molds and dies than the subset that was finally bought by Elcor. The evidence, however, permitted the jury to find that Elcor bid on the list of 96 molds and dies without any knowledge that some were missing or owned by others.6 Further, Crawford's testimony that Elcor had found only 20 to 40 dies is coupled with the statement that many were obsolete and "[h]ad not been running for years." The jury could well have thought that, whatever the number owned by Bevmar, Schneider had no business appraising such items at an average value apiece of $16,000 (auction) to $42,000 (in place). ______ Third, the district court held that because the discrepancy reflected a difference between market value and scrap value, plaintiffs were required to offer expert evidence that Schneider had erred in adopting a market value approach; absent such expert guidance, said the court, the jury would be left to "speculate" on which approach was correct. Rhode Island law, even assuming that it controls on this issue, does not automatically require expert testimony ____________________ 6The 96 molds and dies were advertised as a lot, and the Elcor testimony is open to the inference that its representative was surprised when the post-auction survey revealed fewer than had been promised. -14- -14- to show negligence. Murphy v. United Steelworkers, 507 D.2d ______ ___________________ 1342, 1345-46 (R.I. 1986). But we agree that, if a choice were required between competing concepts of value or competing techniques of appraisal an expert might well be required.7 Here, however, the evidence permitted the jury to assume that Schneider's concept of market value was proper but to conclude that he had negligently assigned excessive market values to many of the molds and dies. And we conclude that the jury was capable of appraising the plaintiffs' evidence of disparity and fault on its own, although expert testimony would surely have been prudent and helpful. There is nothing recherche about the reasoning behind the inferences based on the huge discrepancy between appraisal and proceeds, the suspiciously uniform estimates, and Schneider's failure (if the jury so found) to visit each of the sites and inspect the molds. B. Reliance and Causation B. Reliance and Causation ______________________ This brings us to the second element of the negligence cause of action for which the district court found a failure ____________________ 7Piletz' deposition suggests that he did believe that a different method of appraising molds and dies than the telephone survey used by Schneider was called for. It is very doubtful that Piletz' alternative approach was explained adequately to permit the jury to reject Schneider's method. But plaintiffs' far better case was that Schneider had used a permissible method but botched the job by failing to do any adequate inspection or make adequate inquiry. -15- -15- of proof, namely, justifiable reliance. A bit of background is required. The evidence suggested that there were discrepancies, of several different kinds, between what Dovetech appraised and what Bevmar actually owned. The missing molds and dies and uncertainties about ownership of others have already been mentioned. It also appears that some of the machinery and equipment in the appraisal may have belonged to a Rhode Island state entity but was counted in the appraisal. The district court found a lack of justifiable reliance because, it said, the plaintiffs were not entitled to rely on the appraisal to establish that Bevmar owned the items appraised. To the extent that the items were not owned by Bevmar, naturally the security interest in Bevmar's inventory of equipment, machinery, molds and dies had a reduced value. Therefore, the court concluded, "the evidence establishes as a matter of law that there was no justifiable reliance on the appraisal to establish the expected security interest in these assets." Plaintiffs concede that the ownership of the items appraised was not within the scope of the representations in the appraisal. At most, the appraisal purported to appraise property at Bevmar's facilities or, in the case of some molds and dies, property Bevmar claimed to have lent to its subcontractors. Thus it is true that plaintiffs would have no case if their cause of action depended on showing that -16- -16- they reasonably relied upon the appraisal to establish Bevmar's title. It seems to us that plaintiffs' cause of action, specifically the showing of reliance and injury, does not depend on such a showing. The problem is confused because plaintiffs in this case have been somewhat fuzzy in their theory of damages. It is often attractive for a plaintiff with evidence of wrongdoing and evidence of loss to throw the evidence to the jury and hope that the jury will make a causal connection. In this case plaintiffs had available two different theories, and there are hints of both in its pleadings and arguments. One theory is that, but for the misappraisal, plaintiffs would not have invested at all and would still have their $3.5 million; the other is that their security interest would have been worth more if the appraisal had been accurate. Plaintiffs offered their own testimony on the first theory, namely, that they would not have made the initial investment if they had known that the assets in question were worth far less than the appraisal said.8 From this standpoint, it does not matter whether some of the assets in question belonged to Rhode Island or to Bevmar ____________________ 8The testimony on this issue is not crystal clear but it was adequate for the jury to draw such a conclusion. And given the importance the Crawford group attached to the appraisal, evidenced by other facts (e.g., the inquiry to ____ Schneider and a separate inquiry into Ross-Dove's reputation), the conclusion is eminently plausible. -17- -17- subcontractors. If plaintiffs' testimony is accepted, then the mistaken appraisal "caused" the loss in the familiar "but for" sense: but for the mistake, the loss would not have occurred. (We defer for the moment questions of intervening cause.) The validity of the security agreement simply does not matter. Its validity very much does matter on the second possible theory of injury, namely, that the misrepresentation caused loss insofar as it overstated the value of the security interest, reducing plaintiffs' protection in the event of bankruptcy. On this theory, any misestimate of value would indeed be harmless as to those assets that were _____________________________ misappraised but were not owned by Bevmar. Whether one _____________________________________________ speaks of unjustified reliance or lack of causal connection, plaintiffs' damage claims would be proportionately reduced. Perhaps any damage recovery on this second theory might be ___ speculative on this record;9 but we need not decide the point for there is nothing obviously wrong with the first theory as a basis for getting to the jury. Defendants on appeal offer a different argument as to why Crawford's reliance on the appraisal could not be justifiable reliance. They argue that the appraisal by its ____________________ 9Arguably, it would be plaintiffs' responsibility to show which assets were owned by Bevmar and the extent to which, as to those assets, the appraisal figure exceeded the price received at auction. It is unclear whether the record permits such an allocation. -18- -18- terms required the consent of Dovetech before it could be distributed to third parties other than Marik and Bevmar and that, at least implicitly, this caveat made reliance on it by third party investors unreasonable. This view, if accepted, would undercut both of plaintiffs' possible theories of injury. It was not adopted by the district court as a basis for the directed verdict. There was evidence at trial that Dovetech knew that its appraisal would be distributed to financing sources such as plaintiffs. Crawford also testified that he told Schneider that he (Crawford) and others were going to rely on the appraisal in making their investment and Schneider reaffirmed its validity. Piletz testified that appraisers know that their work will be relied on by third parties. Thus a jury might find that, even if the appraisal caveat is read as defendants urge, Dovetech had waived its protection or had treated the Crawford group as among those for whose benefit the appraisal had been done. Finally we turn to the district court's third and last reason for its directed verdict, which can be described as accepting an "intervening cause" defense. The district court found that the lists of assets appraised by Dovetech did not match the list of assets included in plaintiffs' security agreement filing; that attorneys acting in some measure for plaintiffs disbursed plaintiffs' money at the closing before -19- -19- certain of plaintiffs' conditions were satisfied; and that the bankruptcy trustee had challenged the validity of the plaintiffs' security interest in the pending bankruptcy proceedings (a challenge that has now apparently been dropped). The first and last of these "intervening causes" of injury are irrelevant so far as the plaintiffs proceed on their first theory of recovery: as already shown, that theory does not depend on the validity of the security agreement at all. The remaining "intervening cause" is the attorneys' alleged failure to insist at the closing that other promised third-party investments in Bevmar be committed and that certain liens against its property be satisfied. The district court's conclusion may rest on the assumption that, if the client instructions had been followed, either the initial $3 million would never have been paid over or, less likely, the conditions if satisfied would have prevented the failure of Bevmar. There was some evidence of the attorneys' supposed disregard of instructions, but very little about the significance or consequences of such disregard. Rhode Island law is not especially friendly to an intervening cause defense, nor especially precise; and a jury instructed -20- -20- according to the state's case law might have considerable latitude.10 Measured against such language, we do not think that the evidence presented as to counsel's alleged mistake at the closing compelled a jury to decide that an _________ intervening cause was responsible for the plaintiffs' loss. Whether in presenting their defense defendants could offer more powerful evidence on this point is another matter. III. CONCLUSION To sum up, we agree with the district court that there was insufficient evidence of fraud to submit that claim to a jury. But in our view the jury did have sufficient evidence, judged at the close of the plaintiffs' case, to find material error in the appraisal and negligence in its preparation. While plaintiffs may face hurdles on issues of justifiable reliance, causation, and damages, we think for reasons explained above that a directed verdict on those grounds cannot be justified at this stage. ____________________ 10Thus, "an intervening act will not insulate a defendant from liability if his negligence was a concurring proximate cause which had not been rendered remote by reason of the secondary cause which intervened." Roberts v. _______ Kettelle, 356 A.2d 207, 215 (R.I. 1976). The first negligent ________ act will be rendered remote if "a second actor has become aware of the existence of a potential danger caused by the negligence of a first actor and the second actor acts negligently with regard to the dangerous condition, thereby bringing about an accident with injurious consequences to others." Walsh v. Israel Couture Post, No. 2274 V.F.W., 542 _____ ____________________________________ A.2d 1094, 1096-97 (R.I. 1988). Further, "an intervening act of negligence will not insulate an original tortfeasor if it appears that such intervening act is a natural and probable consequence of the initial tortfeasor's act." Id. at 1097. ___ -21- -21- On remand this case should be settled, if humanly possible. The discrepancy between the appraisal value and the amount ultimately realized for molds and dies, coupled with the doubts raised about the appraisal's thoroughness, ought to make the defense quite uneasy about fault. On the other hand, the defense may be able in its own case to do a better job of explaining the discrepancy between the appraisal and auction price of the 96 molds and dies appraised by Schneider. How a jury will dispose of the intervening cause defense is anyone's guess. And even if a jury makes an award, the award can be appealed. The parties now have a pretty fair gauge of the respective strengths and weaknesses of their positions. Money spent on further litigation is a loss to both sides regardless of the outcome, since most litigation expenses are not recoverable. Full reconstruction of the events in this case for a jury is likely to be especially expensive. We think counsel would not be serving the interests of their clients if they failed to make an earnest effort to settle this case. The judgment of the district court is affirmed insofar ________ as it granted judgment as a matter of law on the claims of fraud and aiding and abetting and is vacated with respect to _______ the negligence claims. The case is remanded for further ________ proceedings. No costs. -22- -22-