COMBUSTION ENGINEERING,
INC., Plaintiff, Appellant,

v.

MILLER HYDRO GROUP, et
al., Defendants, Appellees.

COMBUSTION ENGINEERING,
INC., Plaintiff, Appellee,

v.

MILLER HYDRO GROUP, et al.,
Defendants, Appellants.

Nos. 93–1266, 93–1267.

United States Court of Appeals,
First Circuit.

Heard Aug. 6, 1993.

Decided Dec. 30, 1993.

John H. Montgomery with whom Gordon F. Grimes, David A. Soley, Diane S. Lukac, Faith K. Bruins and Bernstein, Shur, Sawyer & Nelson, Portland, ME, were on briefs for plaintiff.

George S. Isaacson with whom David W. Bertoni and Brann & Isaacson, Lewiston, ME, were on briefs for defendant Miller Hydro Group.

Roy S. McCandless with whom Robert S. Frank, Mark K. Googins and Verrill & Dana, Portland, ME, were on brief for party-in-interest appellee Kansallis–Osake–Pankki.

Before BOUDIN and STAHL, Circuit Judges, and FUSTE,* District Judge.

BOUDIN, Circuit Judge.

This appeal arises out of a complex commercial dispute, with overtones of deception, relating to the construction of a hydroelectric facility in Maine. In the ensuing litigation, neither the builder, Combustion Engineering, Inc., nor the owner, Miller Hydro Group, succeeded in recovering against the other. Both appeal. We affirm the district court.

## I. BACKGROUND

In the early 1980's, Miller Hydro set about creating a hydroelectric facility on the Androscoggin River near Lisbon Falls, Maine, to generate electricity. It first negotiated a contract with Central Maine Power Company by which the latter agreed to purchase a set amount of power from the planned facility. Miller Hydro also obtained financing from a Finnish bank, Kansallis–Osake–Pankki, and a license to build the project from the Federal Energy Regulatory Commission ("FERC").

In May 1986, Miller Hydro entered into a contract—the central document at issue in this case—with Combustion Engineering for the latter to build the facility on a "turnkey" basis. The turnkey contract, by cross-reference, provided for a facility including turbines with a capacity of 7800 cubic feet of water per second.[1] Under its contract with Maine Central Power, Miller Hydro was expected to provide power capacity of 14 megawatts, and the Miller Hydro contract with Combustion Engineering also referred to this requirement by cross-reference.

Subject to these and other specifications, it was entirely up to Combustion Engineering to design and build the new facility. The turnkey contract contained incentive and penalty provisions, one of which lies at the heart of this case. The price set for construction was fixed at just under $24 million, but the contract provided that Combustion Engineering would earn a sliding-scale bonus for efficiency to the extent that the facility produced power in excess of 77,500 megawatt hours per year; a corresponding penalty provision reduced Combustion Engineering's fixed price to the extent that the facility was less efficient than a specified minimum output of 73,500 megawatt hours per year.

The turnkey contract provided that the bonus or penalty would be determined by certain tests that would be performed by an independent tester at the completion of construction. A protocol specified how the test would be conducted, including a requirement that the facility be tested at a "total flow of 7800 cfs." It also permitted Miller Hydro to require a retest by a different tester if it were dissatisfied with the initial test. It appears that if Combustion Engineering had built a highly efficient plant of the size specified, Miller Hydro might have been liable for a bonus payment as large as $850,000.

What happened instead is that Combustion Engineering built a far larger plant with turbines having a maximum flow capacity of over 9000 cfs or more and a power capacity of 18 to 19 megawatts. Miller Hydro claims that this increase in size was done deliberately and secretly by Combustion Engineering in order to manipulate the bonus provisions of the construction contract. Miller Hydro and Kansallis–Osake–Pankki both say that they did not learn of the increase until it was too late to modify the facility.

---

* Of the District of Puerto Rico, sitting by designation.

**1.** The 7800 cfs figure, which is important to this case, appears in technical specifications annexed to the turnkey contract. A shorter and more general "project description," also annexed, refers to turbine discharge capacity of "approximately 8,000" cfs.

When the facility was tested at a total flow of 9000 or more cfs, the tester reported results that equated to a bonus of over $8 million. In Miller Hydro's view, Combustion Engineering had invested $1 million or so of its own money in increasing the facility's size in order to reap a ten-fold increase in the incentive bonus. Miller Hydro also objected to the test itself and invoked its right to a retest. It also refused to state its "final acceptance" of the facility, or to make final construction payments. Instead of agreeing to a retest, Combustion Engineering promptly brought suit against Miller Hydro in district court.

In its complaint Combustion Engineering set forth claims based on contract, unjust enrichment, and promissory estoppel, and it sought to enforce a mechanic's lien against the facility. As damages, it demanded an incentive bonus of $8.16 million, a final construction payment of $45,364, a further payment of $1,236,427 in amounts withheld from prior payments, and a claimed early completion bonus of $893,894. Kansallis–Osake–Pankki intervened, arguing that Combustion Engineering had by contract subordinated its rights under the mechanic's lien statute to the bank's mortgage on the facility.

Miller Hydro counterclaimed against Combustion Engineering asserting contract, fraud, and racketeering claims. Miller Hydro tells us that Central Maine Power has not agreed to buy the extra power that the facility can generate and that Miller Hydro will or may incur additional costs as a result of the facility's enlarged size. In particular, it says that it may face penalties from FERC for building a facility larger than the license permits, and that it may have to reconstruct fish-protection facilities that were keyed to the originally planned smaller turbines.

Because the case presented both legal and equitable claims, the district court bifurcated the trial. In the first phase, Combustion Engineering tried its contract claims to the jury and Miller Hydro tried its contract and fraud counterclaims to the same jury. (Miller Hydro's racketeering counterclaim was dismissed by the court in circumstances recounted below.) In the second phase the trial judge proposed to rule himself on Combustion Engineering's equitable claims (unjust enrichment and promissory estoppel) and to resolve any outstanding issues concerning the mechanic's lien claim, including priority as between Combustion Engineering and Kansallis–Osake–Pankki.

After Combustion Engineering presented its case in chief to the jury, the district court entered judgment as a matter of law against Combustion Engineering on its contract claims. The court held that Combustion Engineering had materially breached its contract in testing the facility at a total flow in excess of 7800 cfs and in other departures from the test protocol. The court found it unnecessary to reach Miller Hydro's argument that the refusal of Combustion Engineering to agree to a retest was also a breach of contract that barred recovery.

Miller Hydro's own contract and fraud counterclaims against Combustion Engineering were submitted to the jury together with a special verdict form. On January 23, 1992, the jury returned its verdict, finding that Combustion Engineering had breached the contract by designing the facility for a maximum flow in excess of 7800 cfs, and not in accordance with the FERC license. It found the actual maximum flow to be at least 9000 cfs and the power output capacity to be 18 megawatts. It also found that Combustion Engineering had provided materially false information to Miller Hydro. Nevertheless, the jury awarded no damages to Miller Hydro either for breach of contract or fraud, finding (in response to special verdict questions) that Miller Hydro had not proved damages from the breach of contract or the misrepresentations.

On October 6, 1992, the trial judge filed a decision denying Combustion Engineering recovery on its equitable claims. The court held that under Maine law material breaches of contract did not automatically preclude an equitable recovery but that the plaintiff's good faith effort to perform was a prerequisite; and the court ruled that Combustion Engineering "did not seek in good faith to meet its obligations under the turnkey contract," given the deliberate breaches and misrepresentations found by the jury. The

jury findings, the court said, were binding on the court in deciding the equitable claims.

On the same day, the trial judge denied a motion by Combustion Engineering requesting the court to order a retesting of the facility, to appoint a special master, and to allow the filing of a supplemental complaint. The court ruled that this motion, filed on June 3, 1992, well after the jury verdict, came too late. Not only had extensive discovery been conducted but the jury trial had already been held and the case was nearing completion. Further delay, said the court, would be unfair to both of the other parties.

Finally, by decision entered on December 22, 1992, the trial judge ruled on Combustion Engineering's mechanic's lien claim. It rejected the claim on the ground that enforcement of such a lien required a valid underlying claim and that Combustion Engineering had been found to lack such a valid claim. The court granted Kansallis–Osake–Pankki's request to discharge the mechanic's lien. It also granted Miller Hydro's requests, made in its counterclaims, for declarations of breach of contract and misrepresentation by Combustion Engineering.

On January 11, 1993, the court entered final judgment in the case. Combustion Engineering has appealed the directed verdict against it on its contract claims, and the denial of its equitable claims, 812 F.Supp. 260, its mechanics lien claim, and its motion to retest. Miller Hydro has appealed the earlier dismissal of its racketeering counterclaim. Neither side has explicitly sought to disturb the judgment on Miller Hydro's contract and fraud counterclaims entered upon the jury verdict.

## II. DISCUSSION

Combustion Engineering advances a series of different arguments on appeal, variously involving the directed verdict against it on its contract claims, the dismissal of its equitable claims, the district court's refusal to order a retest, and the ruling discharging the mechanic's lien. We begin with these issues,

reserving for the end a discussion of Miller Hydro's cross-appeal.

 Combustion Engineering's first, and most extensively briefed, point on appeal is its attack on the district court's grant of a directed verdict—now renamed judgment as a matter of law, Fed.R.Civ.P. 50(a)—dismissing Combustion Engineering's contract claims against Miller Hydro. We review such a dismissal *de novo*, asking whether on the evidence presented a reasonable jury could find for the plaintiff. *Murray v. Ross– Dove Co.*, 5 F.3d 573, 576 (1st Cir.1993). In considering this question, it is assumed that issues of credibility are resolved, and inferences from evidence drawn, in favor of the non-moving party. *Id.*

 At the threshold one might think that the attack on the directed verdict is barred by the jury's subsequent findings. These findings, on Miller Hydro's counterclaims, establish that Combustion Engineering breached the turnkey contract by building a plant well in excess of the contracted for capacity. Miller Hydro claims that Combustion Engineering has forfeited its right to challenge those findings by failing to "appeal" from the jury verdict; Combustion Engineering replies that appeals are from judgments, not findings, and that it has appealed the judgment rejecting its contract claims.

We think that in this case the jury findings do not settle the propriety of the directed verdict. The jury verdict might insulate the directed verdict if the jury in deciding the counterclaims had *independently* reached the same conclusion on the same issue. But here the trial judge, in submitting the counterclaims to the jury, instructed the jury that as a matter of law "the turnkey contract required the construction of a hydroelectric facility.... designed to accommodate a maximum hydraulic flow of 7800 cubic feet per second."[2]

A central theme of Combustion Engineering's argument on appeal is that the contract did not make 7800 cfs a maximum figure.

---

2. The court also told the jury that the court itself had rejected Combustion Engineering's contract claims because the court had found (in directing a verdict) a material breach of contract by Com-

bustion Engineering, namely, its failure to show compliance "with the testing requirement of testing at a total flow of 7800 cfs" as required by the protocol annexed to the turnkey contract.

We think it would be odd to uphold the directed verdict on the ground that the jury found the same thing as the district judge (namely, that the 7800 cfs figure was a ceiling) when in fact the district judge told it to do so. This is not to say that the district court erred in so instructing the jury—on the contrary, we agree with its reading of the contract—but rather to explain why we think that the directed verdict decision by the district court is not insulated by the jury verdict and should be reviewed on the merits.

■ Turning to the merits, the first issue before us in relation to the directed verdict is whether the testing protocol required that the final acceptance test be conducted at a maximum of 7800 cfs. Although formally this is a separate issue from whether the turnkey contract made 7800 cfs the maximum size for the facility, we think that the reality here is that the two issues are interrelated. One might be able to read the 7800 cfs figure differently in the test protocol and the contract design specifications, but would be unlikely to do so in this case. Combustion Engineering treats the two issues together, and so do we.

The district court construed the turnkey contract and ruled as a matter of law that the 7800 cfs figure was a target and ceiling figure for both construction and testing of the facility. As noted above, the 7800 cfs figure does appear in annexed technical specifications although apparently not in the body of the contract itself. This cross-reference might not be conclusive if it stood alone, but it does not stand alone. Two other pieces of evidence *intrinsic* to the contract—the FERC license and the test protocol—support the view that the 7800 cfs figure was both target and ceiling for the project.

First, the FERC license was incorporated in the turnkey contract by cross reference, the contractor promising to construct the facility in accordance with the license. The FERC license refers to the project as having turbines with a total capacity of 14 megawatts, a figure that the turnkey contract

treats as a counterpart to the 7800 cfs figure. As already noted, the turnkey contract refers to 14 megawatts and the annexed technical specifications to 7800 cfs.[3]

Second, the test protocol annexed to the turnkey project clearly provided for testing at "a total flow of 7800 cfs." One can imagine a contract providing for a facility with a large capacity while limiting the test to some lower figure (perhaps the expected normal flow). Here, however, the reference to the same figure in the technical specifications and in the test protocol strongly suggests as a matter of common sense that the facility was to be built and tested at that figure.

Combustion Engineering's brief argues that the 7800 cfs figure was actually intended as a *minimum*, urging that the figure be read as akin to other figures in the contract that are allegedly performance minima. Combustion Engineering also suggests that in any event the 7800 figure was only a rough approximation. It also argues that the parties contemplated modifications in whatever figure was chosen. Finally, it claims that Miller Hydro learned of the increase and waived its objection. Some of these arguments are in tension with others, and none is persuasive.

■ There may be figures in the turnkey contract that are performance minima. But certainly the normal reading of a performance or capacity figure in a *license* is that, like the speed limit sign on a highway, it is intended as a maximum. Here, the contract said that the facility was to be built in accordance with the license, and the license provided for a 14 megawatt facility, a figure that the contract's technical specifications equated to a facility having a capacity of 7800 cfs. Thus, we think that 7800 cfs was a target and ceiling and not a minimum.

■ We agree with Combustion Engineering's claim that, even treating 7800 cfs as a ceiling, there may be room for minor deviations; but an increase to over 9000 cfs— there was some testimony that 9600 cfs or

---

**3.** There was also evidence that the license application initially reflected a flow of 6800 cfs and that approval of FERC to increase this to 7800 was obtained in 1985. However, there is some doubt that this evidence could be described as intrinsic, at least in the form submitted, and we do not rely upon it to sustain the directed verdict.

more was the real capacity—is hardly a minor change. Correspondingly, the megawatt capacity increased from 14 megawatts to 18 megawatts or more, hardly a minor adjustment. The engineer who assisted Combustion Engineering testified that a change from 7800 cfs to 9000 cfs or more would be material.

■ There were provisions for modification of the turnkey contract by agreement, but Combustion Engineering has not proved any agreement by Miller Hydro permitting the contractor to exceed the 7800 cfs figure. As for the claim of waiver or estoppel, that issue was submitted to the jury. The jury's verdict that Combustion Engineering breached the contract by constructing a facility in excess of 7800 cfs appears implicitly to reject the waiver or estoppel defense. This is quite understandable since there is no clear evidence that Miller Hydro knew of the change in capacity until it was too late to alter course, and substantial evidence indicates that Combustion Engineering sought to conceal its deviation.

Combustion Engineering argues that at the very least the contract was ambiguous, so that extrinsic evidence should have been admitted and the issue submitted to a jury. Some jurisdictions follow the traditional binary rule that an integrated contract is either clear or ambiguous and, in the former case, extrinsic evidence is excluded; other states follow the so-called modern approach, allowing extrinsic evidence to "interpret" even a seemingly unambiguous document. *See* A. Farnsworth, *Contracts* § 7.12, at 521–23 (1990). But we need not decide in this case precisely how Maine resolves the problem, because Combustion Engineering has not properly pointed to any extrinsic evidence that could alter the result.

We say "properly" pointed because Combustion Engineering's brief does have an entire page of capsule summaries of documents, events or testimony purporting to comprise relevant extrinsic evidence. In this page of summaries, not a single reference appears to a transcript page or an exhibit number or to an appendix or addendum page. There is some similar material in the fact statement of the brief, with record or appendix references,

and we have sought to match up the summaries with relevant portions of the fact statement. Having done so as best we can, our conclusion is that this "evidence," even if considered, does not create ambiguities warranting jury resolution.

To take Combustion Engineering's first capsule summary as an example, the brief says that an engineer working for both Combustion Engineering and Miller Hydro told the latter that "the Turbine Specifications were minimums that did not limit Combustion Engineering's right to select appropriate equipment." The engineer's actual letter, however, merely affirms the contractor's right to design the generator and electrical equipment and says that "the overall performance expected of the equipment was outlined in the minimum criteria...." Nothing in the quotation associates the general reference to minimum criteria with the 7800 cfs figure. The balance of the evidence summarized by Combustion Engineering is even less persuasive.

■ Later in its brief, Combustion Engineering makes a quite different argument. It says that even assuming that a violation of the test protocol occurred, this should not debar Combustion Engineering from all recovery under the contract. It argues that testing was directed to fixing the efficiency bonus or penalty, and that proper testing should not be found to be a "condition precedent" to recovery of other amounts, such as the final payment due under the contract or sums retained temporarily from prior payments. The company also invokes the notion that "substantial performance" is sufficient to allow it to sue on the contract.

It may be a close question whether standing alone the breach of a testing protocol—among other breaches, Combustion Engineering tested the facility at a flow far greater than 7800 cfs—should preclude recovery of the balance of the contract price as well as the possible bonus. If this were the posture of the case, we would be obliged to engage in a close reading of the test protocol and its relation to the rest of the contract. One can certainly conceive of a case in which the contractor failed to fulfil a requirement need-

ed to earn a bonus payment but would not, in ordinary circumstances, be deemed to lose the right to collect the basic price for work done.

Here, however, Combustion Engineering violated not only the test protocol but the contract specifications by building an oversized facility, and the breach was substantial and deliberate. The jury verdict alone confirms the substantial breach, and its deliberate character is patent from Combustion Engineering's misrepresentations and efforts at concealment. Even if the violation of the testing protocol did not preclude all further recovery under the contract, assuredly the substantial and deliberate breach did so and precludes a contractual claim based on substantial performance.

■ This premise of a substantial and deliberate breach also disposes of Combustion Engineering's equitable claims for unjust enrichment and promissory estoppel. We agree with the district court that, even if such claims may be permitted under Maine law where contractual claims have been lost, Maine law appears to make good faith a condition of such equitably based recoveries.[4] Here Combustion Engineering's good faith is disproved by the jury verdicts. The verdicts were binding on the court, *see Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and are amply supported by the evidence.

This outcome becomes even more compelling when one appreciates that the deliberate and substantial breach placed Miller Hydro at risk of significant harm. There may be cases where building "more" than one promised is a benefit to the owner; but that is hardly assured in the case of a federally licensed dam. Indeed, it may be that Miller Hydro itself will ultimately suffer because of violation of its federal license terms or because the fish protection facilities will have to be rebuilt. Nor is it clear that it has gained

by obtaining extra power that it says it can neither sell to Central Maine Power nor economically wheel to other customers.

Miller Hydro alludes to these possibilities without providing much supporting detail. We have no way of knowing how much substance there is to them, nor whether short term disadvantages may be offset in part, or even outweighed, by the long-term benefits of a larger facility with a greater capacity to produce power. What we do know is that Combustion Engineering was not entitled to create such risks for Miller Hydro by secretly deviating—substantially and deliberately—from the terms of the contract. That one behaving in this fashion now forfeits the balance due under the contract does not seem in the least unfair.

■ Combustion Engineering has two remaining arguments that require little discussion. It first argues that the court should have granted its motion for a retest of the facility in accordance with the protocol. This demand was made not only after Combustion Engineering had turned down Miller Hydro's own request for retest, but after the directed verdict and the jury verdict in this case. The district court's refusal to grant this highly belated, if not impudent, request for equitable relief was well within its discretion.

■ The other argument is Combustion Engineering's attack on the district court's refusal to grant it relief under the Maine mechanic's lien statute. It may be an oversimplification to say that the statute creates only an additional remedy and not a new right; but it is clear that under Maine law, as in many jurisdictions, the mechanic's lien depends on the claimant having a valid underlying claim for monetary recovery based on the construction performed. *Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co.,* 151 Me. 145, 116 A.2d 664, 666 (1955). Combustion Engineering has no such valid under-

---

4. The most recent Maine decision to which we are cited, says that an equitable recovery may be allowed when the builder provided materials or services "in an honest endeavor" to perform the contract. *Loyal Erectors v. Hamilton & Son, Inc.,* 312 A.2d 748, 755–56 (Me.1973); *Accord, Levine v. Reynolds,* 143 Me. 15, 54 A.2d 514, 517 (1947). Even if Maine law is more fluid, allow-

ing the judge some flexibility in weighing the equities, see A. Horton & P. McGehee, *Maine Civil Remedies,* 11–17 (2d ed. 1992), we are certain from its statements here that the district court would exercise that discretion to disallow recovery, and we would have no difficulty sustaining that decision.

lying claim in this case, so the district court properly discharged the mechanic's lien.

There remains Miller Hydro's own appeal. As already noted, the jury found (in deciding Miller Hydro's counterclaims) that Combustion Engineering had breached its contract and engaged in misrepresentation but that the proof did not support a finding of damages from the breach or falsehoods. Miller Hydro does not challenge these verdicts, which limited its judgment on these claims to declaratory relief. Rather, it argues that the district court erred by dismissing its remaining racketeering counterclaim and declining to submit that claim to the jury.

The remaining counterclaim comprised three related counts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). In substance, these RICO counts, asserted in a pleadings amendment, charged Combustion Engineering and various of its employees with a fraudulent scheme to obtain inflated bonuses from one or more power-plant construction projects. Various uses of the mails or telephone system in aid of the fraudulent scheme were alleged. For the RICO violations, Miller Hydro sought damages, injunctive relief, and attorney's fees.

After the RICO counts were added, Combustion Engineering on April 16, 1991, moved to dismiss the counts under Fed.R.Civ.P. 12(b)(6) for failure to state a claim; it asserted as grounds for dismissal various somewhat technical defects in the RICO counterclaims (*e.g.*, that a separate "enterprise" had not been sufficiently alleged). On October 4, 1991, the district court granted the motion to dismiss but on a ground only barely suggested by a footnote in the motion, namely, that an earlier, October 19, 1990, discovery order by the magistrate judge had found a failure of Miller Hydro to make out a *prima facie* case of fraud by Combustion Engineering.

The magistrate judge's order had been entered in resolving discovery disputes including Miller Hydro's claim that Combustion Engineering had lost the protection of the attorney client privilege as to certain materials because its attorney was participating in a fraudulent scheme. Interpreting Maine law governing the privilege, *see* Me. R.Evid. 502(d)(1), the magistrate judge found that Miller Hydro's evidence thus far made out the necessary *prima facie* case on "the first three elements of fraud [knowing or reckless misrepresentation of a material fact] but not the final two [purpose and effect of inducing reliance]." Absent sufficient proof of each element needed to prove fraud, the magistrate judge found no loss of the privilege and refused to order protection of the documents in issue.

On appeal, Miller Hydro complains sharply that in resolving the Rule 12(b)(6) motion the district judge had no right to rely on materials beyond the pleadings without giving Miller Hydro notice and an opportunity to counter the extra-pleading material. Although Rule 12(b)(6) does require "a reasonable opportunity" to counter material outside the pleadings, the magistrate judge's finding of no *prima facie* case was cited in Combustion Engineering's motion to dismiss and arguably Miller Hydro had the necessary opportunity to counter it. This court has looked through form to substance in applying the rule's requirement. *See Moody v. Town of Weymouth,* 805 F.2d 30, 31 (1st Cir.1986).

What is more troublesome is Miller Hydro's further, substantive argument that the magistrate judge's finding cannot support the district court's order dismissing the RICO claims. All that the finding showed, says Miller Hydro, is that in October 1990, while discovery was still underway, it lacked enough evidence to show that all elements of fraud had been made out to the extent needed to vitiate the attorney client privilege.[5] Even assuming that the standards are the same for proving fraud in relation to the attorney-client privilege issue and in relation to a RICO claim, it does not follow that evidence was equally lacking in October 1991 after further discovery had been conducted.

The district court did not discuss any of the evidence in its brief order of dismissal in

---

**5.** The standard of proof is rather elusive since a *prima facie* case does not require definitive proof; yet the fraud claim itself has to be proved under Maine law by clear and convincing evidence.

October 1991. Further, the court actually allowed the Maine fraud claims made by Miller Hydro to go the jury. Yet common alleged acts of fraud underlay both the Maine fraud and the RICO fraud counts. Indeed, Miller Hydro argues that RICO fraud is easier to prove than fraud under Maine law because the latter requires that each element be proved by clear and convincing evidence. The district court's seeming concession that there was enough evidence of fraud under Maine law adds to doubts whether we could sustain the court's dismissal of the RICO counts based on the magistrate judge's finding.

■ We need not resolve the matter, however, because the jury's verdict taken together with other circumstances persuades us that Miller Hydro was not prejudiced by the dismissal of the RICO claims. The jury found that no damages had been proved by Miller Hydro on the two counterclaims that did reach the jury even though the jury found both breach of contract by Combustion Engineering and acts amounting to fraud. The central damage claims argued to the jury by Miller Hydro—e.g., delay costs, prospective rebuilding of the fishways—are common to the Maine fraud and RICO fraud claims, and the jury finding of no damages on the former suggests the same outcome would have resulted on the latter.

Miller Hydro argues, although without much detail, that its damage claims based on breach of contract were somewhat narrower than those covered by fraud. Its theory is that contract damages must be within the contemplation of the parties but fraud damages need not be, and we will assume that this is so. But Miller Hydro does not suggest (attorney's fees aside) that its actual damages ̇ for fraud were narrower under Maine law than under RICO and, given the common acts of alleged fraud, it is hard to see why the damage claims under RICO would be broader. Instead, Miller Hydro

simply asserts that the fraud damage claims under Maine law required clear and convincing evidence while those under RICO required merely a preponderance of the evidence.

It is by no means clear that the jury was told that the fraud damages under Maine law had to be proved by clear and convincing evidence.[6] But even if the jury had been explicitly told clear and convincing evidence was required in computing damages, we would still find no showing of prejudice in this case. Perhaps where the issue of damages is shown to be very close—turning, for instance, on a clash of expert opinions—the asserted difference in burden of proof between a common law fraud and a civil RICO claim could be decisive. See Wilcox v. First Interstate Bank of Oregon, 815 F.2d 522, 531 (9th Cir.1987). But the burden of showing prejudice is upon the party claiming error, and we think that here that burden has not been met.

Miller Hydro's main efforts at trial appear to have been devoted to establishing Combustion Engineering's breach of contract and fraud, findings very important in shoring up Miller Hydro's own defense to Combustion Engineering's claims against it. After a directed verdict was served, Miller Hydro chose to present no case in chief of its own in support of its own counterclaims. Instead, Miller Hydro relied upon the evidence that Combustion Engineering had offered in its own case in chief before the directed verdict was granted. It is not surprising that, absent an affirmative independent showing as to how Miller Hydro would suffer from the larger facility, the jury awarded no damages. Miller Hydro's decision to stop while ahead was probably good tactics, but it does not suggest that an adjustment in the burden of proof would have altered the result.

More important, there is nothing in Miller Hydro's reply brief—which offers the burden

---

**6.** The district court's generally lucid instructions did tell the jury that the elements of fraud under Maine law had to be established by clear and convincing evidence. But when the court came to instructing on the computation of damages, where it discussed contract and fraud damages together, it did not say that any of *these* determi-

nations had to be made by clear and convincing evidence. Indeed, the jury could easily have inferred the contrary because the court went on to say that an award of exemplary damages did require a finding of malice by clear and convincing evidence.

of proof distinction as the basis for presuming·prejudice—that discusses the evidence of damages in any detail or provides any basis for believing that a different standard of proof could alter the result in this case. In the present circumstances, including the nature of the jury instructions and the seemingly limited weight placed on damages at trial, we think that the theoretical possibility of a different result is not enough. And absent a showing that would suggest a real possibility of a different result, it is time for this already lengthy litigation to come to an end.

Having considered consequential damages, it remains to address two other possible differences in remedy. First, the RICO statute allows attorney's fees to a person "injured in his business or property" by a RICO violation. 18 U.S.C. § 1964(c). It is far from clear, however, that such attorney's fees would be available where, as here, the jury finds that no actual injury has been proved. Again, given the absence of some showing by Miller Hydro that a jury could award damages limited solely to attorney's fees, we think that no showing of prejudice has been made.

Second, Miller Hydro argues that under RICO it would have been entitled to injunctive relief that remains of continuing importance to it. Specifically, it asserts that Combustion Engineering, having had its belated motion for a retest denied by the district court, is now trying (how is not explained) to pursue its demand for a retest through other means. This conduct, says Miller Hydro, constitutes continuing RICO fraud that the district court would have been asked to enjoin if the RICO claims had not been dismissed. *See* 18 U.S.C. § 1964(a) (injunctive remedy available under RICO).

We think this is too thin a reed on which to hang a remand and further litigation under RICO. Taken together, the district court's dismissal of Combustion Engineering's contract and equitable claims and the court's denial of the belated motion for a retest establish definitively that Combustion Engineering has no further claim for a retest or any other remedy under the turnkey contract. If Combustion Engineering were to

pursue any such claim through an independent law suit, we think that sanctions for baseless litigation might well be available.

### III. CONCLUSION

This case could plausibly have been settled at the outset by, for example, payment of any remaining amounts due under the contract but without any bonus payment. Now, after wearisome and no doubt expensive litigation over an imperfect contract and imperfect conduct, neither side has gained what it sought at the outset. This may itself be a form of justice, but it could have been achieved at a lower price.

*Affirmed.* No costs.