**Marketa WILLS, Plaintiff, Appellant,**

v.

**BROWN UNIVERSITY, et al.,
Defendants, Appellees.**

No. 98–1701.

United States Court of Appeals,
First Circuit.

Heard Dec. 11, 1999.

Decided July 15, 1999.

Sheila A. Engelmeier with whom Shane H. Anderson and Mackall, Crounse & Moore, PLC were on brief for appellant.

Steven M. Richard with whom Peter J. McGinn, Tillinghast Licht & Semonoff Ltd., Beverly E. Ledbetter, and Janice E. Wright were on brief for appellees.

Before BOUDIN, LYNCH, and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

This appeal involves a lawsuit seeking damages for sexual harassment brought in the district court by the plaintiff, Marketa Wills, against Brown University and one of its former teachers, Professor Kayode Adesogan. The principal issues on appeal, but not the only ones, involve Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* The background events and the proceedings in the district court are as follows.

Adesogan, a chemistry professor at a Nigerian university, taught as a visiting professor at Brown between 1991 and 1994. In the fall semester of 1992, Wills—then a sophomore at Brown—took a course in organic chemistry. Although assigned to a section taught by Professor Ronald Lawler, Wills began to attend lectures in the other organic chemistry section, this one taught by Adesogan. Wills had earlier introduced herself to Adesogan at a social event and attended a small study group held by Adesogan in addition to his formal lectures.

On December 9, 1992, Wills sought out Adesogan in his office because she was having difficulty in the course. During this encounter, while purporting to pray with Wills, Adesogan twice pulled Wills into his lap, allegedly put his hand under her shirt, rubbed her stomach and twice touched or rubbed her breasts. The next day Wills met with Dean Karen Romer, who was then associate dean of academic affairs and had special responsibility for sexual assault or harassment claims; on December 14, 1992, Wills filed a written complaint. This incident lies at the core of Wills's subsequent suit against Brown and Adesogan.

In response to Wills's written complaint, Provost Frank Rothman and Dean of Faculty Bryan Shepp met with Wills on December 14, 1992, and then separately with Adesogan on December 15, 1992. Adesogan admitted hugging Wills, drawing her onto his lap and touching her breast, although he denied placing his hand under Wills's shirt. By letter dated December 23, 1992, Rothman placed Adesogan on probation, stating in a written reprimand that a further incident would be grounds for immediate dismissal but that this appeared to be Adesogan's first instance of improper behavior during his stay at Brown.

Rothman was mistaken. In October 1992, Adesogan had inappropriately hugged and touched another student, Laura Schleussner, who was enrolled in his section and had come to meet with him for help. Schleussner had then met with Dr. Barbara Tannenbaum, a lecturer at Brown, who was acting as an ombudswoman for Brown to oversee sexual harassment services. At trial, Schleussner and Tannenbaum gave somewhat different versions of the meeting, especially as to how much detail Schleussner provided. It appears that Schleussner wanted to remain anonymous but did want something done to prevent repetitions.

Schleussner had also complained to a chemistry department lecturer whom she knew and trusted, and that lecturer spoke in due course with Lawler, who taught the other section of organic chemistry. Lawler in turn told Adesogan that students would feel more comfortable if Adesogan kept his door open when conferring with students, but Lawler—who may have known few details—did not further advise the provost or anyone else in Brown's administration.

In February 1993, Rothman accepted the recommendation of the chemistry department that Adesogan be retained for another year and given a raise. In September 1993, another student, Tilly Gurman, filed a complaint that Adesogan had sexually harassed her in the fall of 1992. Romer informed Rothman, and Romer suggested no action because the Gurman incident had occurred *before* Adesogan had been reprimanded, and both Romer and Rothman believed that the warning to Adesogan in December 1992 had been sufficient.

In January 1994, another student, Amy Sanford, reported to Romer that between the fall of 1993 and January 1994, Adeso-gan had engaged in inappropriate conduct with Sanford (*e.g.*, by repeated hugs and kisses), and Sanford told Romer that Adesogan had previously harassed another friend. Romer reported the matter to her immediate superior but it was not carried further, apparently because Sanford had not wanted it officially pursued.

Wills, after her own experience with Adesogan in December 1992, had not sought any further contact with him. She saw him thereafter on two different occasions: first, on an unspecified date, Adesogan entered a drugstore where Wills was working, and Wills immediately retreated to a back room; second, in January 1994, Wills enrolled in another chemistry course and discovered that Adesogan was the teacher. Wills testified that she rarely attended the lectures after the first session, but Adesogan did not long remain at Brown. During March 1994, Brown received further complaints of harassment by Adesogan from six or more other female students. That same month Brown dismissed Adesogan. Wills ultimately graduated from Brown and later enrolled in medical school in Pennsylvania.

In December 1995, just short of three years after her meeting with Adesogan, Wills filed a complaint in district court against Brown and Adesogan. The complaint set forth eight counts against Brown, Adesogan, or both, under state law (counts I through VIII [1]) and two further federal claims against Brown under Title IX, one designated "hostile environment sex harassment" (count IX) and the other designated "quid pro quo sex harassment" (count X). Adesogan never responded, and the case proceeded solely against Brown. A default judgment in the amount of $275,000 was later entered against Adesogan.

---

1. The state claims were for assault and battery (count I), negligent hiring, supervision and retention, and entrustment (counts II–IV), intentional and negligent infliction of emotional distress (counts V–VI), and sex dis-crimination under Rhode Island's civil rights statute (counts VII–VIII). Both defendants were named in counts I and V, Adesogan alone in count VIII, and Brown alone in all others.

In due course, Brown moved for summary judgment as to all counts against it. Following a hearing on November 24, 1997, the district court granted summary judgment in Brown's favor as to the claims for negligent hiring (count II), negligent retention (but not negligent supervision, which was a part of the same count III), negligent entrustment (count IV), and intentional and negligent infliction of emotional distress (counts V and VI). Thereafter, the court denied summary judgment on Wills's claims based on a hostile environment theory of sex discrimination. This theory was explicitly set forth in count IX based on Title IX (and by implication in count VII under the state civil rights statute).[2]

This disposition left for trial four separate claims against Brown: assault and battery (count I), negligent supervision (count III), and sex discrimination based both on a hostile environment and a quid pro quo theory (counts IX and X). Trial began on March 19, 1998, and when Wills rested her opening case, the district court granted Brown's motion for a directed verdict only as to the assault and battery claim and the quid pro quo sex discrimination claim. Fed.R.Civ.P. 50(a). Following further evidence, the negligent supervision and hostile environment claims were submitted to the jury.

On March 31, 1998, the jury returned a verdict in Brown's favor on both claims. Thereafter Wills filed a post-trial motion seeking judgment notwithstanding the verdict and, alternatively, a new trial on these same claims. Fed.R.Civ.P. 50, 59. The district court denied Wills's motion and entered judgment in favor of Brown. Wills now appeals, challenging (in her main argument) the district court's exclusion of evidence on her hostile work environment claim which was rejected by the jury. She also attacks the district court's grant of summary judgment on three of the state tort claims, its grant of directed verdicts on her assault and battery and her quid pro quo claims, and its denial of a new trial on the two claims rejected by the jury.

1. Title IX forbids schools that receive federal funding from discriminating against students "on the basis of sex." 20 U.S.C. § 1681(a). Starting from the now-accepted premise that sexual harassment can constitute sex discrimination, *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court has endorsed two different, although related, theories as to how such harassment can constitute sex discrimination either in the workplace (Title VII) or school context (Title IX).[3]

One theory, popularly known as "quid pro quo" harassment or discrimination, occurs most often when some benefit or adverse action, such as change in salary at work or a grade in school, is made to depend on providing sexual favors to someone in authority, *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir.1988); the other theory, under the rubric "hostile environment," applies where the acts of sexual harassment are sufficiently severe to interfere with the workplace or school opportunities normally available to the worker or student. *Meri-*

---

2. Throughout the proceedings, the parties have treated the claim against Brown under the Rhode Island sex discrimination statute (count VII) as paralleling the separate claims for hostile environment and quid pro quo sex discrimination under Title IX (counts IX and X). Wills's brief on appeal does not refer separately to the state civil rights statute.

3. Title VII similarly forbids discrimination in employment "because" of sex, and in some respects, but not others, the two statutes are construed in pari materia. *Cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 1997, 2002, 141 L.Ed.2d 277 (1998). Recently, in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998), the Supreme Court raised some doubt as to how long the two theories of harassment will be treated separately, but Wills's case was tried on the assumption that there are two distinct theories.

*tor*, 477 U.S. at 66, 106 S.Ct. 2399; *Davis v. Monroe County Bd. of Educ.*, —— U.S. ——, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). In this case, Wills advanced both theories against Brown—one in count IX and the other in count X. But the evidence now in dispute was offered as support for the hostile environment claim (the quid pro quo claim never reached the jury).

■■■ Broadly speaking, a hostile environment claim requires the victim to have been subjected to harassment severe enough to compromise the victim's employment or educational opportunities and, in the case of a Title IX claim (but not under Title VII), the institution must have had actual knowledge of the harassment and have exhibited deliberate indifference to it. *Gebser*, 118 S.Ct. at 1997–99. If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment. *Id.* Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability.

From the outset, Wills's main claim based on a hostile environment theory has been that Wills was harassed by Adesogan on December 9, 1992, and that Brown is responsible for Adesogan's wrongdoing under Title IX because Brown had prior notice of the earlier Schleussner episode but did *nothing* to prevent the threat to other students such as Wills. Wills wanted the jury also to know that after her own harassment on December 9, Brown did not immediately remove Adesogan from the faculty or otherwise take action beyond the reprimand; and, far more important, she wanted it to know that Brown later received additional complaints from others in 1993 and 1994 that Adesogan had harassed a half-dozen or more additional victims. The admissibility issue was presented and resolved *in limine*.

In excluding the evidence, the district judge reasoned that if Brown had sufficient prior knowledge of the Schleussner episode—and this was a fact question—then it was responsible for Adesogan's action on December 9, 1992, regardless whether it later took adequate remedial steps and regardless whether it got later complaints from other students. Conversely, even if the remedial steps were inadequate and other students were later harassed, this did not create liability on Brown's part for Adesogan's harassment by Wills on December 9, 1992, *before* the reprimand and before the complaints received in 1993 and 1994. On this theory, the judge drew a sharp line between what happened before and after December 9, 1992.[4]

At different times, Wills has offered different theories as to why the post-December 9 evidence in question is relevant to Brown's liability, but the argument principally made in the district court—and the only argument fairly developed in her opening brief in appeal—is this: the showing of an inadequate response to harassment is a standard issue in Title IX litigation and (says Wills) she was therefore entitled to show that Brown's response in December 1992 was inadequate and failed to prevent the harassment of other students thereafter. Wills has cited throughout a set of cases, including one of our own, where inadequate response evidence was central. *See, e.g., Gebser*, 118 S.Ct. at 2000; *Lipsett*, 864 F.2d at 902–07.

■■■ The difficulty for Wills is that evidence of an inadequate response is pertinent to show fault and causation where the plaintiff is claiming that she was harassed or continued to be harassed *after* the inadequate response. *See Gebser*, 118 S.Ct. at 1999; *Lipsett*, 864 F.2d at 907. But here, as already noted, Wills's claim was of a single specific harassment incident that oc-

---

4. The line was drawn with respect to evidence designed to show Brown's liability; in proving damages, Wills was allowed to show not only the assault on December 9, 1992, but also her own condition and reactions thereafter during the remainder of her stay at Brown, including her distress in seeing Adesogan at the drugstore and in the classroom.

curred *before* the reprimand and the later complaints (albeit one that caused continuing damages). There is no mechanical rule that makes such evidence relevant or irrelevant in the abstract: relevance depends on the facts and the theory of the case being pressed.

Here, in relation to Brown's liability for the December 9 incident, the reprimand evidence was perhaps thinly relevant because, although it had nothing to do with whether Brown had prior notice before December 9 or whether Adesogan's behavior on that occasion violated the statute, it could arguably have been admitted as casting some backward light on Brown's general attitude—and therefore on the issue whether Brown was "deliberately indifferent" in its handling of the Schleussner claim and the resulting exposure of other students, including Wills, to Adesogan's behavior. But the reprimand was at best marginal to the main issues at trial—the key evidence on "deliberate indifference" was what Brown knew and what it did in response to Schleussner's complaint—and, taken alone, the reprimand was more favorable to Brown than to Wills (Brown wanted it in evidence). As it happens, the jury later learned that Adesogan had *not* been fired until 1994.

■ Wills's real hope was the evidence as to later claims made by *other* students, Brown's arguably casual treatment of the Sanford claims in January 1994, and the obvious harm inflicted on others by Adesogan's continuing depredations. Yet, this evidence is even more remote to Brown's general attitude in 1992, had a potential for severe prejudice, and would have required the trial to explore circumstances surrounding claims and acts of harassment of *other* victims which—unlike the Schleussner episode—had nothing to do with the vital question whether Brown had notice *prior* to December 1992.

In her reply brief on appeal, Wills offers a different theory entirely. In effect, she asserts that Adesogan's *harassment* of her continued after December 1992 because

Adesogan remained as a teacher and Wills was shocked and upset to find him in January 1994 as her teacher in new chemistry course. Her deposition gives a somewhat tamer description of her reaction, but in any event Wills was not required to take any course from Adesogan. Wills's other exposure to Adesogan was a chance glimpse of him in a drugstore at some earlier, unidentified point.

■ It is sufficient answer that theories offered for the first time in the *reply* brief are not preserved. *Executive Leasing Corp. v. Banco Popular*, 48 F.3d 66, 67–68 & n. 3 (1st Cir.1995). Indeed, it is doubtful that Wills said enough in the district court to preserve the argument for appeal; at best, there are a few hints. But even if preserved below, the argument has to be renewed in the opening brief on appeal, so that the appellee has a chance to respond. Reply briefs are to counter the appellee's arguments, not to offer new theories of error for the first time. Nevertheless, Wills's belated continuing harassment theory is a very weak one on these facts. On some cases, merely to maintain a harasser in a position of authority over the victim, after notice of prior harassment, could create new liability. But it would not be easy to describe Adesogan's mere presence on a large campus as harassment of Wills, or to describe Brown's reasonably firm reprimand as representing "deliberate indifference" under *Davis*, 119 S.Ct. at 1673. Brown's treatment of Sanford's January 1994 complaint is a closer question on the latter issue, but even here Sanford's request for anonymity is not irrelevant and the connection to Wills is slight.

However, we need not decide whether this continuing harassment theory could be made to work on the present facts. Even if this theory was fairly presented to the district judge which we doubt—Wills did argue that she had suffered *damages* after December 1992 but that is a quite different matter—it was not preserved on appeal.

Needless to say, this conclusion is not an endorsement of Brown's handling of the Adesogan debacle, which was remarkably inept even when one appreciates that there are due process values for the professor and concerns about student anonymity that help shape university procedures.

█ Wills's remaining evidentiary claims can be briefly answered. She complains that in a non-responsive answer to a question from Wills's counsel, one of the Brown officials testified that Brown had fired Adesogan, and Wills then brought out the fact that he was not fired until March 1994. The district court did not permit further inquiry, and Wills now says that she was "severely prejudiced" by the non-responsive answer and wrongly deprived of the opportunity to explain to the jury that the reason he was fired was "for sexually assaulting nearly seven women in one week."

But telling the jury that Adesogan had been fired in 1994 was hardly harmful to Wills: it showed that Brown did not fire Adesogan in December 1992—the very point that Wills says she was so anxious to present to the jury to show the inadequacy of the reprimand—and it probably indicated to the jury that Adesogan's behavior was even worse than it had already been led to believe by Wills's own testimony. The reasons for excluding the March 1994 harassment incidents has already been discussed.

█ Finally, Wills complains that she was prevented from offering testimony from two students, Tilly Gurman and Eve Zaritsky, who were ready to testify that Adesogan had harassed them in the fall of 1992. Gurman admittedly did not report the incident to Brown until September 1993, and there is no indication that Zaritsky ever reported her allegations. Nothing supports Wills's argument on appeal that the evidence should have been admitted because it increased the likelihood that Brown knew of these incidents prior to December 1992 and was therefore more culpable for failing to remove Adesogan prior to the December 1992 incident with Wills. One other objection to testimony involving former Brown dean, Toby Simon, is not worth discussing.

2. We turn now to Wills's remaining claims of error, starting with the district court's grant of summary judgment as to three of her ten claims: intentional infliction of emotional distress, negligent hiring, and negligent retention. Wills has not appealed from the grant of summary judgment as to the negligent entrustment claim. All four of the these claims are governed by Rhode Island law.

█ Starting with intentional infliction of emotional distress, the tort requires "extreme and outrageous" conduct that "intentionally or recklessly" causes severe emotional distress, which must include some physical symptoms. *Andrade v. Jamestown Housing Authority*, 82 F.3d 1179, 1187 (1st Cir.1996); *Elias v. Youngken*, 493 A.2d 158, 163–64 (R.I.1985). Wills's opening brief simply asserts in a few sentences that Brown's conduct was extreme and outrageous because it ignored student complaints of sexual harassment by Adesogan and thereby "allowed Adesogan to assault Ms. Wills unfettered."

The only knowledge that Brown was shown to have had before the "assault" was the Schleussner incident, but it is common ground that Schleussner did not want to file a formal complaint. Very difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment. Viewed in retrospect, Brown's procedures left much to be desired. But there is nothing to the notion that Brown was behaving outrageously when it failed to pursue the Schleussner complaint beyond the limited informal measures instigated by Schleussner herself.

█ Under Rhode Island law, an employer is required to exercise reasonable care in selecting its employees.

*Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436 (R.I.1984). Wills says that Brown made no search of Adesogan's background before hiring him as a visiting professor beyond a look at his work and resume and an inquiry to one of his colleagues. Whether more was reasonably required does not matter because Wills pointed to no evidence that a more searching inquiry by Brown in Nigeria or elsewhere would have alerted it to the problem he posed. The district court dismissed the claim on this ground and Wills simply ignores this issue on appeal.

Wills's last argument, as to summary judgment, is that the district court should not have stricken the reference to "retention" in her count claiming negligent supervision and retention. The district court struck the retention language because it said that no authority had been provided for such a claim under state law and it thought that the multiplicity of locutions was confusing. The court also said that there was no basis for finding Brown negligent in not firing Adesogan prior to December 1992 and that the only plausible claim was for negligent supervision, which the court sent to the jury.

 Assuming for the moment that there is a separate state law claim under state law for negligent retention, the two claims on these facts are very close and lack of adequate supervision is certainly the stronger of the two. Indeed, on appeal—in the very brief passage addressed to this issue—Wills muddles her two theories by arguing that "Brown did not supervise or monitor" Adesogan, or give him sexual harassment training or counseling, even after he was put on probation. On the present facts, we are not persuaded that Wills adequately explained her separate "retention" theory or was prejudiced by its omission.

 The remaining substantial objections are to the district court's grant of a directed verdict in favor of Brown on two other counts: the quid pro quo theory of sexual harassment under Title IX and the assault and battery claim under state law. The test, in both cases, is whether a reasonable jury could on the evidence presented find in favor of Wills, resolving doubts and credibility issues in her favor; and our review on this issue is de novo. *Combustion Eng'g, Inc. v. Miller Hydro Group,* 13 F.3d 437, 441 (1st Cir.1993).

The quid pro quo theory presents the more complicated issues and we begin with it. Quid pro quo cases normally involve situations in which someone with authority over the victim inflicts a penalty or withholds a benefit to obtain sexual favors, *Lipsett,* 864 F.2d at 898, and it is easy to understand why the district judge doubted that this case fell into that category. Wills was not a student of Adesogan in December 1992, he had no authority over her grade, he never said anything that conditioned her grade or his tutoring services on Wills's agreeing to submit to his advances, and—as the district court pointed out—she did not testify that she understood Adesogan to be making to such a threat. Accordingly, the judge withdrew this theory from the jury.

We are not certain that we agree with the district court's reasoning, although the question may be a close one and need not be finally resolved here. Patently, Wills's stronger claim was for hostile environment and the quid pro quo claim is a stretch. Indeed, in *Ellerth,* the Supreme Court recently spoke of the "limited utility" of distinguishing between quid pro quo "threats that are carried out" and "bothersome attentions" so severe as to create a hostile environment. 118 S.Ct. at 2264. But at present the categories remain and, if they are to be entirely elided, it is for the Supreme Court to do so. Thus, our question is one of evidence.

 Here, it could be argued that while Adesogan had no authority over Wills's grade, informal tutoring is a benefit of Brown's offering; Adesogan's hugging and touching effectively cost Wills the opportunity for further tutoring from Adeso-

gan; and it does not matter whether Adesogan expressed such a threat or whether Adesogan or Wills so interpreted the situation. Certainly threats need not be explicit, *see Lipsett*, 864 F.2d at 913; *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 339 (5th Cir.1998), and it is probably an open question under the case law whether this kind of benefit (informal tutoring from a professor not the student's teacher) is enough to create liability under a quid pro quo theory.[5] But even if we assume *dubitante* that there was enough evidence to get to the jury on a quid quo pro claim, there is no way that such an instruction could have altered the outcome here. Sometimes the quid pro quo and hostile environment theories connect to markedly different facts. Imagine a quid pro quo case where a raise is denied to the employee because the employer was turned down on a simple request for a date; and contrast a hostile environment claim based on crude sexual remarks from fellow employees. But on our facts, the theories effectively overlap: the only sense in which a benefit was denied was that Wills felt so uncomfortable in the environment that Adesogan had created that she herself refused to avail herself of his tutoring. This essentially common issue explains why, in *this* case, the difference between the two theories tends to disappear. *Cf. Ellerth.*

Brown chose in its closing argument to focus primarily on the lack of notice to Brown based on the Schleussner episode, arguing that there was a conflict between Tanenbaum and Schleussner on the issue and that Tanenbaum should be believed. Secondarily, Brown argued that Wills had not been damaged. Either theory would also dispatch the quid pro quo claim but the jury may have adopted neither of these arguments; during jury deliberations it asked the judge to further explain the concept of hostile environment. He de-

clined to elaborate, and a general verdict followed in favor of Brown so we do not know on what ground the jury actually resolved the matter.

However, even if the jury found both notice and damage, a jury that (improbably) thought Adesogan's actions too mild to create a hostile environment could not easily have concluded that Wills had been denied the benefit of Adesogan's tutoring. Thus, on the realistic assessment we are asked to make under the harmless error doctrine, there is no practical likelihood that the weaker quid pro quo claim would have prevailed before a jury that rejected the stronger (and manifestly more applicable) hostile environment claim. On our facts, the refusal to instruct on quid pro quo, assuming *arguendo* that it was error, was harmless.

This brings us to Wills's claim that the district court erred in directing a verdict on the assault and battery charge. Since Adesogan's conduct could easily be viewed as assault, the directed verdict turned on whether Brown could be held liable under Rhode Island law for the intentional tort of assault by Adesogan, Brown's employee. Wills argues that under Rhode Island law, a jury could find Brown liable for Adesogan's offensive touching of Wills on December 9, 1992, because it occurred during the course of an activity that he was hired to perform, namely, the instruction of students. The district judge ruled that this was not the law of Rhode Island.

Although (surprisingly) we are not entitled to give special weight on this issue to the experience of the district judge with Rhode Island law, *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994), the cases confirm his conclusion. In Rhode Island, an employer is not liable for an assault by its employee merely because it occurred during the course of employee's

---

**5.** Obviously, this lost benefit is different from the loss of good grades or like matters; Wills could certainly have sought tutoring from her own professor. But where one draws the line is far from clear. There is little case law, *but* compare *Lipsett*, 864 F.2d at 913–14, *with Lam v. Curators of the Univ. of Mo.*, 122 F.3d 654, 657 (8th Cir.1997), and one possible approach is to leave this line-drawing to the jury in close cases.

work. *Labossiere v. Sousa*, 87 R.I. 450, 143 A.2d 285 (1958) (no liability where waitress pushed customer). Rather, where the employer has not actually authorized the assault, conduct must itself be a reasonable and foreseeable incident of the employee's duties. *Bryce v. Jackson Diners Corp.*, 80 R.I. 327, 96 A.2d 637 (1953) (store manager sought to restrain a customer trying to leave without paying).

█ Obviously, it was no part of Adesogan's duties to hug and grope students who came to him for tutoring. Rhode Island could easily extend liability for intentional torts more broadly and may have done so by statute in some situations. But it has not done so for assault, and the line drawn by *Labossiere* and *Bryce* remains in force. *Drake v. Star Market Co., Inc.*, 526 A.2d 517 (R.I.1987). Accordingly, the assault claim was properly withdrawn from the jury because—fully accepting Wills's version of events—Adesogan but not Brown was liable for the assault under state law.

█ Wills's final ground for appeal is the district court's denial of her motion for new trial on the two remaining claims (hostile environment and negligent supervision) rejected by the jury. The district court's discretion in granting or denying a new trial is very broad and the arguments made by Wills are in substance some of the same claims we have already addressed (and no others). This was surely a close case on the claims that went to the jury and it could easily have been resolved in Wills's favor, but juries are there to decide close cases, and nothing required the district judge to afford Wills a new trial.

The judgment of the district court is *affirmed*. Each side shall bear its own costs on the appeal.

*It is so ordered.*

LIPEZ, Circuit Judge, dissenting.

This is a vexing case for many reasons. The facts are difficult. The applicable law is complex and evolving. Struggling with these unruly elements, the trial court imposed a simple but erroneous limitation on Wills's Title IX hostile environment claim by taking an unduly restrictive view of the relevant evidence. Wills's articulation of this hostile environment claim, both at trial and on appeal, was not a model of clarity. The waiver issue on appeal is a close one. In the end, however, despite the thoughtful analysis of my colleagues, I cannot agree that Wills waived on appeal her claim that Brown is liable for hostile environment sex discrimination on the basis that Brown failed to respond adequately to the hostile educational environment created by Adesogan's assault on her and by his continuing presence in the classroom after that assault. That conclusion requires me to explain why I believe that Wills is entitled to a new trial on her claim.

## I. Waiver

The discussion of the waiver issue on appeal requires an understanding of Wills's presentation of her hostile environment claim to the trial court. Wills presented a hostile environment claim that was premised, in part, on Brown's liability for the December 9, 1992 assault. The district court allowed this claim to go to the jury and she fairly lost on it. But Wills also presented a separate hostile environment claim that was premised on Brown's liability for its inadequate response to the hostile educational environment which arose for Wills following the December 9 assault. For the purposes of this claim, Wills consistently maintained that subsequent events evidence (events following the December 9, 1992 assault) was relevant to establishing Brown's liability.

Beginning with her complaint, Wills alleged that as a result of Adesogan's sexual assault, she was

> deprived ... of the opportunity to receive the full benefit of her education during the relevant period at Brown University. Brown knew or should have known of the environment created by

Adesogan and failed to take proper remedial action to eliminate the harassment caused by Adesogan and inflicted upon Wills.

In her memorandum in support of her Motion for a Partial Summary Judgment, Wills argued, inter alia, that a single incident of sexual harassment can be severe enough to give rise to a hostile environment and that Adesogan's assault on her was "sufficiently severe or pervasive to alter her education and create an abusive educational environment. . . ." Later, during a pre-trial hearing, Wills requested additional time to conduct discovery on issues pertaining to Brown's response to her notice of the assault. She argued that

one of the issues in this case is whether Brown took prompt remedial action. Brown is taking the position that one of the pieces of evidence of the fact that they took prompt remedial action is that Ms. Wills was satisfied with what they did. Well, when Brown promises that they are going to give her an advocate to help her figure out what's appropriate, was inappropriate, whether she should be satisfied with what her options are, I'd like to inquire why that didn't happen when that is their policy.

The court took a different view of the relevance of such evidence:

I think we are coming back to this fundamental disagreement that we seem to have. I thought I had ruled on this and put this to rest, but it keeps resurfacing that I recognize that your position is that what Brown may have done or not done after the alleged assault described by Ms. Wills is relevant to this case. And I think, I thought I had ruled that in my view it is not relevant. *It would be relevant if there were a second assault on Ms. Wills that resulted from Brown's inaction then it certainly would be relevant,* but what is relevant, what this case focuses on is what Brown knew prior to the assault on Ms. Wills and what it did or didn't do to prevent that assault from taking place.

(emphasis added). The court's reference to the relevance of a second assault on Wills is particularly important. The court recognized that even if Wills could not prove that Brown knew of the assault by Adesogan on Laura Schleussner, and hence could not establish that Brown should have prevented Adesogan's assault on her, she would still have a claim against Brown for hostile environment discrimination based on the inadequacy of Brown's response to her report of a sexual assault, but only if Adesogan assaulted her a second time. The court did not accept the proposition that the hostile environment could be the product of events that flowed from the single assault by Adesogan, including Wills's reaction to the assault and Adesogan's continuing presence in the classroom.

Despite the court's exclusion from Wills's case of liability evidence subsequent to the December 1992 assault, Brown still felt the need in its oral motion for a judgment as a matter of law at the close of Wills's case to argue that the evidence failed to prove that the assault, although severe, "alter[ed] her educational environment." The background for Brown's concern was a footnote in a First Circuit case, *Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525 (1st Cir. 1995), in which we said that "we do not hold that a one-time episode is per se incapable of sustaining a hostile environment claim." *Id.* at 541 n. 13. In response to Brown's insistence that a hostile environment could not be established by the single incident described by Wills, the court queried:

You're not saying that this incident wasn't a severe incident. It isn't the severity of the incident, but rather you're saying that no matter how severe the evidence doesn't show that it affected Ms. Wills' educational environment?

Brown responded:

Correct, your honor. Adesogan clearly acted in an inappropriate manner and the conduct was severe. The question,

as I understand it, is whether or not it altered her educational environment. And I saw no evidence suggesting that. She functioned very well at Brown, she graduated with a good GPA. Was able to move on in life.

The court then made this observation:

> My question to you is, I guess what— the question you have raised is what constitutes an educational environment. It doesn't sound like you dispute that that would be a highly offensive, despicable, almost every pejorative word you can think of, *and you seem to be suggesting that educational environment means that it's got to carry over into the future and have some tangible effect* —.

(emphasis added). Brown responded again:

> Your honor, that's my interpretation, and I would not disagree with the court that this single incident was inappropriate, the professor behaved in a severe manner, but the question is how we hold the institution liable and what's the education environment, and I would respectfully suggest to the court that you have to look beyond the single incident, otherwise it is a per se rule creating a hostile environment by this one inappropriate action.

At this juncture, the court and Brown both recognized that evidence of Brown's liability for a hostile environment subsequent to the assault by Adesogan on Wills must include evidence beyond the assault itself. Yet that was the very liability evidence that the court had not permitted Wills to introduce.

In response to this colloquy between the trial court and Brown, Wills's counsel attempted to again call attention to the existence of the hostile environment occurring after the assault, focusing on Wills's inability to take advantage of education opportunities on campus. She explained:

> But I believe the testimony in this case was that this incident impacted Ms. Wills' ability to study. She took an incomplete in the class. It impacted her ability to function in the following class and so, therefore, the incident, the single incident created for her a hostile environment, her hostile educational environment for Brown. . . .

Despite its intimations of interest at the close of Wills's case, the court ultimately rejected any claim for hostile environment discrimination based on Wills's experiences or Brown's response after the December 1992 assault:

> My ruling has consistently and clearly been that evidence of what occurred after the alleged assault on Ms. Wills is irrelevant in this case. So I would not allow the evidence on these grounds.
>
> And you can mark for identification that you say the offer of proof would consist of. If you would like to respond in some way, Mr. Richard, I will give you that opportunity. Frankly, I don't see what difference it is going to make, because if this becomes an issue on appeal and the Court of Appeals concludes that this kind of evidence was admissible and might have influenced the outcome, then presumably it would grant a new trial. If it concludes that it wasn't admissible, and it won't, and I don't think it is going to make a great deal of difference exactly what the incidents are alleged to consist of, but I will leave it up to you Mr. Richard.

After the verdict, Wills reiterated in her motion for a new trial that the trial court "prevented [her] from showing Brown failed to take appropriate action to end the harassment. Therefore, [she] could not prove one of the elements she was required to prove under *Lipsett* to establish Brown's liability for hostile environment sexual harassment."

Despite Wills's arguments to the contrary both before and throughout the trial, the court took the position that, absent a second physical assault by Adesogan on Wills, or some form of direct harassment, Wills had no claim for sex discrimination against Brown occurring after December

9, 1992. In taking that narrow view of hostile environment discrimination, the district court failed to recognize that Wills's educational experiences at Brown could be altered significantly by a hostile educational environment resulting from Adesogan's assault on her and his continuing presence in the classroom. That failure, in turn, prompted the court to consistently reject all attempts by Wills to introduce evidence of events following the assault on Wills to establish Brown's liability for hostile environment discrimination.

In Wills's opening brief on appeal, she focused, inter alia, on the school's response to her complaint:

> To determine institutional liability under either *Lipsett* or *Gebser*, a trier of fact must look to an institution's response once it learns of sexual harassment. Ms. Wills submits that to determine whether an official took "appropriate steps to halt" the harassment (*Lipsett*) or whether an official with authority to institute corrective measures was "deliberately indifferent to the teacher's misconduct" (*Gebser*), the trier of fact must examine the institution's response to the complained-of-harassment. This includes an assessment of the action taken against the harasser as a result of the· harassment and whether the harassment stopped. Further, the Supreme Court, many years ago, made clear the determination of a hostile environment must be based on "the totality of the circumstances." As a result of the district court's misapplication of the law in this case, it precluded the parties from introducing evidence, and specifically precluded Ms. Wills from showing Brown's action against Professor Adesogan as a result of Ms. Wills' assault did not end the harassment.... Accordingly, Ms. Wills was not allowed to show a failure to properly address the harassment, considering the totality of the circumstances.

In elaborating on this "totality of the circumstances" view of hostile environment discrimination in her opening brief, Wills focused far too much attention on the trial court's alleged error in excluding evidence of Adesogan's sexual assaults on other female students at Brown before and after the assault on Wills, without relating that evidence to her own experience of a hostile environment at Brown. She did not refer explicitly to her claim that the "totality of the circumstances" of a hostile environment included her reaction to the assault on her by Adesogan and his continuing presence in the classroom.

In her reply brief, Wills referred to the continuing presence claim more clearly: "Wills continued to suffer harm after Adesogan sexually assaulted her due to his continued presence on campus without any real imposition of discipline for his egregious conduct toward her." She then elaborated:

> Wills has standing to challenge Brown's remedial action taken after December 9, 1992, as she was mistreated by Brown when she reported the acts of Adesogan, and continued to suffer harm after that date as a result of Adesogan's continued presence on the campus with unbridled authority to interact with students, including Wills. In addition, Wills has standing to challenge Brown's remedial action ... as Brown had actual notice of Adesogan's misconduct and did not halt the harassment.

Brown never filed a motion to strike this portion of Wills's reply brief as unfairly presenting a new issue. At oral argument there was extensive discussion of the hostile environment claim and the propriety of the district court's decision to exclude all post-December 9, 1992 evidence. In both Wills's argument and Brown's, there were inquiries about Wills's continuing presence claim of hostile environment discrimination. Instead of arguing that Wills had waived this claim by not raising it in her opening brief, Brown addressed the claim on its merits, arguing that there was no

further harassment of Wills by Adesogan following the assault, and that the trial court was correct to exclude any liability evidence subsequent to the December 9, 1992 assault. Brown's only effort at oral argument to avoid the merits of Wills's hostile environment claim involved an assertion, also set forth in its brief, that Wills never made an offer of proof regarding Brown's conduct following the assault in response to her complaints—not that Wills had waived any argument on appeal. In my view, these exchanges demonstrate that the parties always understood, at trial and on appeal, that Wills's claim of hostile environment discrimination, rather than being limited to Brown's responsibility for its failure to prevent Adesogan's sexual assault on Wills, also included her claim that Brown was responsible for the hostile environment discrimination she experienced after the assault because of its severity and Adesogan's continuing presence in the classroom.

Without minimizing the deficiencies in the quality of Wills's opening brief on appeal, I think there is a significant difference between an argument that is waived and one that is argued poorly. Wills argued her continuing presence claim of hostile environment discrimination to the trial court. This argument in the trial court fairly informs the reference to the "totality of the circumstances" claim of hostile environment discrimination set forth in her opening brief on appeal. She returned in her reply brief to the explicit iteration of the continuing presence claim of hostile environment discrimination presented to the trial court. Brown never argued in writing or orally that Wills had waived on appeal this claim of hostile environment discrimination. Given the prominence of this claim before the district court, its adequate explanation in the reply brief, and the attention it commanded at oral argument, Wills's vague reference to it in her opening brief should not preclude our consideration of this important issue.

## II. Wills's Claim

There is no dispute that, following the incident on December 9, 1992, Wills was never again physically assaulted or verbally harassed by Adesogan. Nonetheless, Wills argues that Adesogan's continuing presence on the faculty and in the classroom created a hostile environment that altered the terms and conditions of her educational environment, thereby establishing the basis for a claim of sex discrimination against Brown under Title IX. The majority recognizes that "in some cases, merely to maintain a harasser in a position of authority over the victim, after notice of prior harassment, could create new liability." This is an important recognition. The majority also notes, however, that Wills's "continuing harassment theory is a very weak one on these facts."

I think we should be wary of characterizing the strength or weakness of a case that Wills was never allowed to develop fully because of the exclusionary rulings of the trial court. Nevertheless, given what we do know of Wills's case from pre-trial submissions and arguments before the trial court, I think she offered the outlines of a plausible claim of continuing presence hostile environment discrimination that she was entitled to present to a jury. I therefore agree with Wills that the trial court erred in excluding any evidence of Brown's liability for hostile environment discrimination based on Brown's response to Wills's complaint of a sexual assault by Adesogan and its response to other information and events subsequent to December 9, 1992. I must explain that position more fully.

### A. Title IX and *Gebser v. Lago Vista Independent School District*

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX imposes an ob-

ligation on educational institutions receiving federal funds to refrain from denying educational opportunities on the basis of sex. Title IX is enforceable through an implied private right of action against an educational institution. *See Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). That action can include a demand for monetary damages. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

When Wills brought her case against Brown in 1995, there was uncertainty about the standards of liability for educational institutions under Title IX. The Supreme Court ended this uncertainty in *Gebser v. Lago Vista Independent School District*, rejecting institutional liability based on agency principles or constructive notice to establish institutional liability. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277 (1998). The Court explained that Title IX creates obligations that are contractual in nature, "conditioning an offer of federal funding on a promise by the recipient not to discriminate." *Id.*, 118 S.Ct. at 1997. The focus of Title IX is on "protecting individuals from discriminatory practices carried out by recipients of federal funds." *Id.* This focus differs from Title VII, which prohibits sex discrimination without regard to federal funding.

*See id.* On the basis of the distinct purpose of Title IX, the Court concluded that:

> [I]n cases ... that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond.
>
> We think, moreover, that the response must amount to deliberate indifference to discrimination.

*Id.* at 1999.

Accordingly, in a Title IX action, a plaintiff must allege that the recipient of the federal funds—the educational institution—was deliberately indifferent to discrimination on the basis of sex. To establish the institution's liability, a plaintiff must show that the school had "notice" of the alleged discrimination. *See id.* Even if the school had notice of the alleged discrimination, it is not liable for a Title IX violation unless its response amounted to "deliberate indifference to discrimination." *See id.*

**B. The continuing presence claim of sex discrimination[6]**

Sex discrimination in education involves the denial of educational benefits or the

---

**6.** Wills's case was tried according to a constructive notice theory of liability now rejected by the Supreme Court in *Gebser*. The court instructed the jury according to the principles set forth in *Lipsett v. University of Puerto Rico:*

> [A]n educational institution is liable upon a finding of hostile environment sexual harassment perpetrated by its supervisors upon employees if an official representing that institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, unless that official can show that he or she took appropriate steps to halt it.

864 F.2d 881, 901 (1st Cir.1988). On review, however, we must apply the new standard for institutional liability set forth in *Gebser v. Lago Vista Independent School District*, 524

U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (when the Supreme Court applies a rule of federal law to parties before it, the rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate the announcements of the rule). The new standard of liability set forth in *Gebser* is a more exacting one for establishing institutional liability. Although it may seem anomalous to suggest remanding for a new trial in a case that did not succeed with a less exacting standard of liability, there is no anomaly. Wills did not lose on her continuing presence claim of liability because of the proof required to establish that liability. She lost because she was

alteration of conditions of the educational environment on the basis of sex. *See Davis v. Monroe County Bd. of Educ.,* ——— U.S. ———, 119 S.Ct. 1661, 1675, 143 L.Ed.2d 839 (1999). If sufficiently severe, sex harassment, a form of sex discrimination for the purpose of Title IX, "can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* The denial or alteration can be the result of inappropriate touching, *see Canutillo Indep. Sch. Dist. v. Leija,* 101 F.3d 393, 395 (5th Cir. 1996), the solicitation of sexual favors in return for educational rewards, *see Miller v. Kentosh,* No. Civ. A. 97–6541, 1998 WL 355520 (E.D.Pa. June 29, 1998), a pattern of coercive sexual relations between a student and a teacher, *see Franklin,* 503 U.S. at 63, 112 S.Ct. 1028, or a pattern of severe student on student sexual harassment, *see Davis,* ——— U.S. at ———, 119 S.Ct. at 1673. The effect of such abusive conduct on a victim does not necessarily end with a cessation of the abusive conduct, particularly if the victim and the abuser retain the same or similar roles in an educational institution. In some cases, the continuing presence of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination.

In *Gebser,* a student who had been involved in a sexual relationship with her teacher sued the school district under Title IX. Once the school was given notice of the sexual relationship between the student and teacher, the school immediately fired the teacher. Therefore, the Court had no occasion to consider the relationship between the continued presence of the teacher in the school and altered conditions of education. However, in *Patricia H. v. Berkeley Unified School District,* 830 F.Supp. 1288 (N.D.Cal.1993), a district

court squarely addressed this issue. Patricia H. brought suit against the school district on behalf of her daughters. Patricia H. had been involved with a teacher in the school district (Hamilton) who, she alleged, molested both of her daughters while Patricia H. and Hamilton were dating. Patricia H. filed criminal charges against Hamilton.[7] The school district placed Hamilton on a leave of absence without pay, and then suspended him. The criminal charges were ultimately dismissed, subject to Hamilton's participation in rehabilitation programs and psychological counseling, and his license to teach was reinstated. Hamilton resumed teaching music classes, which he taught throughout the school district, including those schools attended by Patricia H.'s two daughters. On cross-motions for summary judgment, the court was asked to consider whether "the mere presence of Hamilton as a teacher, a figure of authority and respect, in the schools [the two daughters] were attending, or would have attended but for his presence, created a hostile environment that deprived them of full enjoyment, and during the semesters of their absence, any enjoyment, of their education within the [school district]." *Id.* at 1296. The court concluded that

[t]he very severity of the molestation, and the grave disparity in age and power between the girls and [the teacher], suggests that a reasonable student, having experienced such an assault, would be intimidated and fearful of [the teacher's] presence at her school, so much so that her fear would interfere with her ability to learn, and to enjoy all aspects of her education fully, even though the alleged molestations were isolated in time and occurred outside of the school setting. The Court is unable to declare,

---

not permitted to present that claim of liability to the jury.

7. One daughter alleged that Hamilton had forced her to touch his genitals and that he touched her genitals. The other daughter alleged that Hamilton raped her. This second daughter, however, did not come forward at the same time as the first daughter and thus the criminal charges initially brought against Hamilton did not include the later charge of rape.

as a matter of law, that [the students] did not experience a hostile environment in the [school district]. The Court, however, also cannot declare that, as a matter of law, a hostile environment did exist. The question, whether a reasonable female student of [the student's] age, having experienced the harassment she alleges, would find [the teacher's] mere presence at [the school] created a hostile environment, is one question for the jury.

*Id.* at 1296–97 (footnotes omitted).

The proposition that the presence of a harasser can rise to the level of hostile environment sex discrimination finds support in the Title VII context.[8] In *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir.1991), the plaintiff alleged, inter alia, that her employer's decision to allow an employee who had formerly harassed her to transfer back into her office, after a six-month "cooling-off period," created a hostile work environment. The court accepted the plaintiff's argument, concluding that "[w]e believe that in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile work environment." *Id.* The court noted that there may be situations where an employer can only fully remedy the harassment by removing the harasser from the work environment. *See id.* at 883, 883 n. 19.

## C. The continuing presence claim of sex discrimination in this case

### 1. The hostile environment: the conduct of Adesogan and its effect on Wills

Wills was enrolled in organic chemistry in the fall of 1992 because she planned to attend medical school. Because Wills was having difficulty with the material, she went to see Adesogan in his office for help on December 9, 1992 at 4:00 p.m., where she found him meeting with another student. He told her to come back at 5:30. When she returned, Adesogan looked up the grade on her last exam and asked her why she had done so poorly. Wills told him she had a lot of things going on at home and that she had not been eating. He sent her off to get something to eat and told her to come back at 6:30 since there was no way to study chemistry on an empty stomach. When she returned at 6:30 and found the building locked, she called up to Adesogan's office. He came down, let her into the building, and they went upstairs to his office where Adesogan shut the door.

First, Adesogan asked her to join him in prayer.[9] He told her that he was glad she was a Christian and asked God to open up her brain so that she could be more receptive to him and to chemistry formulas and equations. Adesogan then worked with

---

**8.** Although *Gebser* rejected the application of Title VII agency principles for the purpose of determining institutional liability under Title IX, I do not read it to reject prior Title VII case law exploring the *nature* of sex discrimination. In *Franklin v. Gwinnett County Public Schools*, 503 U.S. at 75, 112 S.Ct. 1028, a Title IX case, the Court referred to *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a Title VII case, to discuss sexual harassment. Prior to the Supreme Court's decision in *Gebser*, many courts read that reference to suggest that the Court would apply Title VII *standards of liability* to Title IX cases. In *Gebser*, the Court clearly rejected this proposition and explained:

"That reference to *Meritor* was made with regard to the general proposition that sexual harassment can constitute discrimination on the basis of sex under Title IX, an issue not in dispute here."

*Gebser*, 118 S.Ct. at 1995 (citation omitted). I read this statement in *Gebser* to mean that, although the Supreme Court did not intend to import standards of liability from Title VII case law into Title IX, Title VII cases remain instructive when considering the *nature* of sex discrimination under Title IX. I therefore look to Title VII cases for guidance in considering Wills's claim of hostile environment discrimination against Brown.

**9.** Wills had earlier met Adesogan at a gospel concert. She introduced herself and Adesogan had asked her if she was a Christian.

Wills on chemistry problems until he announced that they needed a break time for prayer. He then picked her up, put his arms around her waist and sat her on his lap. As he "prayed" about Wills's eating problems and her performance in organic chemistry, he allegedly put his hand under her shirt, rubbed her stomach and touched her breast. Wills explained that the first time he touched her breast, his hand just grazed her body and she thought that maybe the touching was an accident. After this "prayer" session they returned to studying organic chemistry. About twenty minutes later, he told her they needed to pray again and he again pulled Wills onto his lap. As he was touching her breasts and praying, he told her: "I want you to understand there is no hanky panky stuff going on—I want to be close to you like father-daughter." Again, they returned to studying. The third time he pulled her onto his lap for a prayer session and rubbed her breasts, he said: "Don't let the Devil confuse Marketa into thinking that anything that went on today was sexual." During each prayer session, which lasted about seven or eight minutes, Adesogan sang religious songs.

The entire meeting lasted about an hour and forty-five minutes. As she was leaving, Adesogan told Wills that she should go to the small group sessions and that she should meet privately with him before the exam. Together, they would be able to "get it." Wills never went back to Adesogan's office, or to another organic chemistry class that year.

As a result of Adesogan's continuing presence on the faculty, Wills felt the need to avoid him, both on the college campus and in her workplace. She delayed enrolling in the second half of organic chemistry in an effort to distance herself from the trauma of what had happened. When

Wills ultimately enrolled in the second half of organic chemistry in the spring of 1994, she discovered that Adesogan was the only professor Brown had assigned to teach the class, a fact she did not know until the day class began. Wills immediately left the class. At trial, she testified that "I probably tried to muster up some courage to go back to class at least once or twice." Other than those occasions, she did not return to the class for the rest of the semester.

In order to complete her pre-med studies, Wills had to take the second semester of organic chemistry. The University sent Wills a letter that spring offering her one of two options for the second half of the organic chemistry class. She could request a grade option change for the course, which would allow her to take a pass in the course rather than a letter grade. As a pre-med student, however, she was advised to first discuss this option with one of the deans. Or, as the letter said, she could "cut her losses," take an incomplete in the course and take the class again in summer school, the tuition for which would be waived. The school also offered to write her a letter that would "contextualize" the difficulties she had experienced. Wills completed the second semester of organic chemistry in summer school.

On these facts, I conclude that a reasonable jury could find that: (1) Adesogan subjected Wills to severe sexual harassment;[10] (2) Wills experienced his continuing presence in the classroom as a hostile environment that altered the conditions of her education at Brown; and (3) a reasonable person subjected to the harassment that Wills experienced would have had a similar reaction to the continuing presence of Adesogan in the classroom. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22,

**10.** In reaching this conclusion, I am not suggesting in any way that my colleagues do not share this view of Adesogan's misconduct. That is clearly not the case as their opinion indicates. They do not discuss the details of his misconduct because of their conclusion of

waiver. Also, their view of the weakness of Wills's claim for hostile environment discrimination does not relate to the severity of his misconduct. It relates, rather, to Brown's liability for Adesogan's misconduct.

114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Davis,* —— U.S. at —— — ——, 119 S.Ct. at 1674–75.

The existence of a hostile environment, however, does not necessarily subject an educational institution to liability under Title IX. Liability only attaches where (1) the educational institution has actual notice of the alleged discrimination, *see Gebser,* 118 S.Ct. at 1999, and (2) the school's response to the discrimination was "clearly unreasonable in light of the known circumstances." *Davis,* —— U.S. at ——, 119 S.Ct. at 1674. When the educational institution "does not engage in the harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment. That is, deliberate indifference must, at a minimum, cause the students to undergo harassment or make them liable or vulnerable to it." *Id.* at 1672 (citations and quotation marks omitted). I must therefore examine the issues of notice and deliberate indifference.

### 2. Notice

The record is clear that Wills filed a written complaint charging Adesogan with sexual harassment. That written complaint was submitted to the Provost of Brown University, who was charged with investigating allegations of sexual harassment. Wills also met personally with the Provost. Thus, Wills informed an official at Brown, with the authority to address the alleged discrimination and to institute corrective measures, of the assault by Adesogan. *See Gebser,* 118 S.Ct. at 1999. The record also contains correspondence between Wills and the Dean of the College, which indicates that the school would accommodate Wills's desire to take an incomplete in organic chemistry. This correspondence suggests that Wills gave notice to the University officials in 1992 that she was unable to continue with her organic chemistry studies because of her experiences with Adesogan. Further, in Wills's "Motion to Determine in Advance of Trial the Admissibility of Defendant's Subse-

quent Acts," she claimed that Brown "was aware that she was continuing to experience emotional and academic difficulties as a result of Adesogan's assault upon her in 1992." Moreover, in a pre-trial conference, Wills's counsel claimed that Wills's name appeared in more than fifteen documents relating to the '93/'94 time frame which indicated that Brown was aware that Wills was continuing to experience significant difficulties at school. At trial, the Dean of the College testified that in the spring of 1994 Wills came to her because of difficulty with the second half of organic chemistry.

In *Gebser,* the school district had received complaints from parents that the teacher involved in a sexual relationship with the student was using inappropriate and sexually explicit language in his class. The Supreme Court rejected the argument that such complaints met the notice requirement of Title IX. "That [notice] . . . consisted of a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Gebser,* 118 S.Ct. at 2000. Contrary to the Gebser scenario, Wills's report to Brown of the sexual assault by Adesogan, of her inability to continue with the study of organic chemistry in the fall of 1992, and of subsequent emotional and academic difficulties she was having because of the assault by Adesogan, was not "plainly insufficient" to alert Brown to the existence for Wills of a hostile educational environment that altered educational conditions for her at Brown. *See id.* at 1999 (the institution must have "actual knowledge of discrimination in the recipient's programs"). Moreover, there is evidence that Brown knew of Adesogan's assaults on other women students at Brown before Wills attempted to take the second half of organic chemistry in the spring of 1994. Accordingly, the next issue is whether Wills

can demonstrate that Brown was deliberately indifferent to discrimination.

### 3. Deliberate Indifference

Once the institution is placed on actual notice of sex discrimination, the institution is given an "opportunity to rectify any violation." *Gebser*, 118 S.Ct. at 1999. If the response is adequate, the institution satisfies its obligations under Title IX. *See id.* Only where the institution's response amounts to "deliberate indifference to discrimination," *id.*, or "is clearly unreasonable in light of the known circumstances," *Davis*, 119 S.Ct. at 1674, will liability attach. This requirement comports with the administrative enforcement scheme for Title IX which contemplates action only when the "official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation." *Gebser*, 118 S.Ct. at 1999. By requiring the plaintiff to prove that the institution's response was deliberately indifferent, there is no "risk that the recipient [of federal funds] would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.*

Only "known circumstances" inform what can be considered a "clearly unreasonable" response. *Davis*, —— U.S. at ——, 119 S.Ct. at 1674. Thus, the adequacy of a school's response may change with an increase in the school's knowledge of the circumstances of discrimination. In a case such as this, Brown might not be liable for Adesogan's individual act of sex discrimination (the sexual assault on Wills) because of a lack of notice of any prior misconduct by Adesogan. Moreover, its initial response to a first complaint of misconduct from Wills might be adequate for the purpose of the *Gebser* and *Davis* analysis. However, what was an adequate response to a single complaint of sex harassment may become "clearly unreasonable" when the school is placed on notice by additional complaints or other pertinent information. *See, e.g., Davis*, —— U.S. at ——, 119 S.Ct. at 1674 (noting that the petitioner might be able to show that the school subjected her to discrimination by failing to respond to complaints of misconduct by both the petitioner as well as other female students). Accordingly, in the context of the hostile environment claim in this case, Wills must demonstrate that Brown's response was deliberately indifferent to the hostile educational environment created for her by Adesogan's assault and continuing presence in the classroom in light of the notice the school received of Wills's ongoing problems with Adesogan's presence and reports from other students of Adesogan's misconduct.

In response to Wills's complaint, the Provost and the Dean of Faculty met with Adesogan who admitted that he had pulled Wills onto his lap, hugged her, and perhaps touched her breast accidentally. The Provost sent Adesogan a letter of reprimand, condemning his behavior and placing him on probation. The Provost warned that "a second incident of unacceptable behavior will constitute grounds for immediate dismissal." However, in the Provost's deposition, he acknowledged a memorandum from the Dean of the Faculty to all Department Chairs and Directors of Programs, issued in September of 1992, summarizing the University's policy prohibiting members of the faculty from engaging in acts of sex discrimination against students. According to the memorandum, "a faculty member or teaching assistant violating the policy will be subject to immediate suspension and/or dismissal." Approximately two months after Wills's complaint about the sexual assault, members of the chemistry department recommended that Adesogan be retained for the next academic year, notwithstanding his "mistakes," and that he be given a raise. Provost Rothman accepted the recommendations and reappointed Adesogan, awarding him a raise.

**42**

Thereafter, more women came forward to notify Brown of Adesogan's misconduct. In September 1993, Tilly Gurman filed a written complaint alleging that Adesogan had sexually harassed her in the fall of 1992, prior to Adesogan's assault on Wills. The Assistant Dean of Academic Affairs and the Provost decided to take no action, concluding that Adesogan had already been reprimanded and warned of the consequences of his behavior following the event with Wills.

In January 1994, Amy Sanford informed the Assistant Dean that Adesogan had hugged and kissed her on a number of occasions in the fall of 1993. Although Sanford did not file a formal complaint, the Assistant Dean did report the allegations to the Dean of the College. No action was taken and Adesogan remained in the classroom. In fact, as already noted, he was the only professor teaching the second half of organic chemistry in the spring of 1994, a gateway course for medical school which Wills had to take. Brown took no further action against Adesogan until March of 1994 when it received complaints from six female students in a one week period that he had assaulted them.

On these facts, I cannot say as a matter of law that Wills could not persuade a reasonable fact-finder that Brown's decision to keep Adesogan on the faculty and in the classroom until March 1994 reflected deliberate indifference to a hostile environment that altered the conditions of Wills's education at Brown. In reaching this conclusion, I am not suggesting that an educational institution, after verifying a claim of sexual harassment by one of its teachers, must terminate that teacher's employment in order to avoid Title IX liability. *Cf. Davis,* — U.S. at — —, 119 S.Ct. at 1673-74. The adequacy of the institution's response, assessed within the rubric of deliberate indifference, will depend on a myriad of factors relating to the nature of the harassment, its duration, the roles of the harasser and the victim before and after the harassment, the na-

ture of their continuing contact, other acts of misconduct by the harasser known to the institution, and the conditions altered by the continuing presence of the harasser.

In this case, a jury never considered this myriad of factors because the district court took an unduly restrictive view of hostile environment discrimination, believing that only a second assault by Adesogan on Wills or some other form of direct harassment would constitute such an environment. The court was unwilling to consider that a hostile environment could exist on the basis of other factors—in this case, the response of Wills to the sexual assault and the continued presence of the harasser in the classroom who, because of his presence, denied Wills a benefit of her education at Brown because of her sex. Title IX protects individuals from such discriminatory practices carried out by the recipient of federal funds. *See Gebser,* 118 S.Ct. at 1997. Wills contends that Brown, through its deliberate indifference, was responsible for that denial of an educational benefit because of her sex. The district court wrongly precluded her from presenting this claim to a jury. We should correct that error.