*703 GREGORY, Circuit Judge,
concurring:
This appeal presents the difficult issue of whether an admittedly inappropriate environment created by a women’s collegiate soccer coach was sufficiently hostile to deprive a player of the benefits of or participation in the team or her education. Because I believe that Melissa Jennings has presented enough evidence, when viewed in the light most favorable to her, to create a triable issue of fact on her Title IX claim, I vote to reverse the district court’s grant of summary judgment. I write separately from the thoughtful majority opinion to express additional thoughts and to respond to specific arguments raised in the well-written dissent.
I.
I agree with the majority that Anson Dorrance’s sexually explicit, inappropriate, and harassing comments directed to other players on the team, but overheard by Jennings, are relevant to determining whether Jennings was subjected to a hostile environment.* See ante at 696. Although the majority of hostile environment cases involve conduct directed at the plaintiff, unlike the dissent, I do not find evidence that “the Supreme Court itself has assumed throughout its Title VII and Title IX cases that only harassment directed and targeted at the victim was capable of creating a hostile environment.” Post at 720. Meritor Savings Bank, FSB v. Vinson held that hostile environment claims were cognizable under Title VII because the Act “affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.” 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (emphasis added). Meritor cited Rogers v. EEOC, 454 F.2d 234 (5th Cir.1971), a case recognizing a hostile environment as potentially violative of Title VII where the employer provided discriminatory service to its Hispanic clientele rather than any direct action against its Hispanic employees. Further, the Circuit Court opinion in Meritor explicitly recognized that “[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.” Vinson v. Taylor, 753 F.2d 141, 146 (D.C.Cir.1985), aff'd in relevant part, rev’d in part, Meritor, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49.
This view fully accords with this Circuit’s decision in Spriggs v. Diamond Auto Glass, a hostile environment case where we noted that “[w]e are, after all, concerned with the ‘environment’ of workplace hostility, and whatever the contours of one’s environment, they surely may exceed the individual dynamic between the complainant and his supervisor.” 242 F.3d 179, 184 (4th Cir.2001) (citing Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir.1998) (“[Rjacist attacks need not be directed at the complainant in order to create a hostile educational environment.”); Vinson, 753 F.2d at 146; Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir.1982) (“The fact that many of the epithets were not directed at *704 [the plaintiff] is not determinative. The offensive language often was used in [his] presence after he had voiced objections to [his employer].”)); accord Jackson v. Quanex Corp., 191 F.3d 647, 660-61 (6th Cir.1999) (noting that the court may consider employer conduct directed towards entire minority group, even in individual Title VII action, and that such conduct was relevant to question of whether environment was subjectively and objectively hostile); Schwapp, 118 F.3d at 111 (“Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment.” (citation omitted)); Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir.1995) (“A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her.”).
As the majority explains, Dorrance’s comments may have singled out individual players at any given practice, but his actions created a “general environment of sexual harassment,” ante at 697, where young women under his control were the subject of humiliating and degrading comments, frequently on the basis of their alleged promiscuity, see ante at 696. I believe that a rational jury could find that this environment, which included the two specific incidents directed toward Jennings, constituted a pervasive hostile environment. Drawing inferences in Jennings’s favor, a rational jury could find that Jennings “live[d] in constant fear” that Dorrance would turn his attention to her. Ante at 698. Indeed, this fear became a reality during the encounter between Jennings and Dorrance in a hotel room at the end of her freshman year.
II.
I agree with the dissent that Dorranee’s hotel-room inquiry to Jennings was plainly vulgar. The dissent concludes, however, that the question was “obviously an inquiry about what was occupying Jennings’ time.” Post at 721. While I agree that a coach would inquire as to whether a player was having personal problems, on this record, taking inferences in Jennings’s favor, I do not think we can conclude as a matter of law that the question was “not made in an attempt to humiliate, degrade, and demean.” Post at 721.
First, as the majority notes, Dorrance’s remarks to his players “frequently carried the strong suggestion of promiscuity,” ante at 696, often employing the same vulgar construction he used with Jennings. He asked players who their “fuck of the week” was, J.A. 1237, if a certain player was “going to fuck [her boyfriend] and leave him,” J.A. 1248, and another player, “[h]ow many guys in the [lacrosse] team did [she] fuck,” J.A. 1238. Because Jennings had heard those remarks and practiced her sport in the abusive environment engendered by them, a rational jury could conclude that Dorrance’s hotel-room inquiry was an attempt to humiliate, degrade, and demean her on the basis of sex. Furthermore, Dorrance’s question assumed that Jennings was engaged in a sexual relationship, unlike a question that would have simply asked whether she was having “boy” or “relationship” problems. To Jennings, the assumption that she was engaged in sexual relations at all offended. See J.A. 1332 (“[Dorrance] asking me if I’m fucking anybody would be the assumption of.... I don’t think anybody would ask that question, unless you are assuming they already had sexual relationships.”). In all candor, it is a close issue whether Jennings’s subjective view meets the objective standard. In this case, however, I *705 believe that a rational jury could find the remark objectively offensive because of the age difference between Dorrance and Jennings, Dorrance’s position of power and trust, and, most importantly, the link between Dorrance’s knowledge of whether a player engaged in sexual activity and his harassment implying that player’s promiscuity.
Finally, omitted from both the majority and dissent’s version of the hotel-room conversation, is the fact that Dorrance, directly after asking Jennings with whom she was having sex, commented that Jennings should feel comfortable sharing things with him — even things she could not share with her father — because he was like a father figure. J.A. 1325. Given this comment and Jennings’s knowledge that Dorrance showed open affection for a fellow team member (Debbie Keller), I do not believe that as a matter of law Dorrance’s question was not “foeus[ed] on sex” and not posed because of Jennings’s gender. Post at 721; see Wills v. Brown Univ., 184 F.3d 20, 39 (1st Cir.1999) (Lipez, J., dissenting) (recounting facts of case involving college professor telling student “I want to be close to you like father-daughter,” during study sessions that included professor fondling student).
In sum, while the hotel-room remark can be viewed as a mere poorly phrased inquiry from a coach to a player about whether relationship problems were interfering with her athletic performance, such a conclusion would require us to draw inferences in favor of Dorrance, contrary to our standard of review. Taking into account the factors discussed above, a rational jury could conclude that Dorrance’s vulgar inquiry was sexual harassment and “part of an abusive pattern that instilled fear and dread.” Ante at 698.
III.
As noted by the majority, a Title IX plaintiff must proffer evidence that the hostile or abusive nature of the environment “ha[d] ‘a concrete, negative effect on [the victim’s] ability’ to participate in an educational program or activity.” Ante at 699 (quoting Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650-51, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). In this case, the proper inquiry is whether the record contains enough evidence to allow a rational jury to conclude that the hostile environment created by Dorrance effectively denied Jennings the benefits of membership on the women’s soccer team and enrollment at the University of North Carolina at Chapel Hill (“UNC”) by making it much more difficult for her to develop and achieve as a student-athlete. See Gabrielle M. v. Park Forest-Chicago Heights, Il. Sch. Dist. 163, 315 F.3d 817, 828 (7th Cir.2003) (Rovner, J., concurring in part and concurring in the judgment); cf. Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring) (“ ‘[T]he plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment.’ It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to ‘ma[k]e it more difficult to do the job.’ ” (alteration in original) (citation omitted) (quoting Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir.1988))).
A.
While I believe that a plaintiffs grades are relevant to the question of the concrete and negative effect of. harassment, an increase or decrease in grades is not disposi-tive. See, e.g., Gabrielle M., 315 F.3d at 828 (Rovner, J., concurring in part and *706 concurring in the judgment) (noting, in case concerning elementary school student, the fact “that [the plaintiffs] grades did not suffer is by no means dispositive”); Montgomery v. Ind. Sch. Dist. No. 709, 109 F.Supp.2d 1081, 1094 (D.Minn.2000) (“[G]rades are not the sole benefit to be derived by a student from an educational experience.”)- In this case, Jennings’s grade point average increased from 1.538 at the end of her first semester in the Fall of 1996 to a cumulative average of 2.022 at the end of her sophomore year, when she was dismissed from the soccer team. J.A. 1449. I disagree with the dissent’s conclusion that an improvement in grades is evidence of the lack of discriminatory impact. See post at 722-23. Discriminatory impact would be shown if Jennings’s grades, though improved, had risen less than they would have had she not been subjected to a hostile environment. In this ease, I believe that Jennings has proffered sufficient evidence to allow a jury to conclude that the hostile environment created by Dorrance affected her academic performance to such an extent that she was deprived of equal access to the benefits of an education at UNC.
During her deposition, Jennings testified that her grade point average was low during her time on the team because she was unhappy and uncomfortable due to the hostile environment created by Dorrance. J.A. 1320. Jennings specifically stated that she “found it hard to focus by just the constant — by the environment that was created — it was very hard to focus.” J.A. 1321. When pressed, Jennings stated that it was the hostile environment created by Dorrance that affected her academic performance, rather than her teammates, her shortcomings as a soccer player, or her coaches’ criticism of her soccer ability. See J.A. 1322-23 (“Q. Was the fact that other girls on the team were critical of your performance as a soccer player part of what was affecting your performance at school? A. No. Like I said before, it was the drinking comments, the comments made about all the girls, and their sexual stuff that just made me uncomfortable.”). As noted by the majority, this testimony is supported by a psychiatrist’s opinion that stress caused by the hostile environment contributed to Jennings’s poor academic performance. J.A. 1583. Despite the subsequent increase in Jennings’s grade point average, a rational jury could find, on the basis of her testimony and her expert witness, that her poor academic performance was a result of her lack of focus due to the hostile environment created by Dorrance or that her grades would have increased even more but for the hostile environment. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 748 (2d Cir.2003) (noting that despite student’s steady academic performance during the period of harassment, her testimony that she was unable to sleep and did not want to attend classes and thus could not concentrate on her studies due to harassment was enough evidence to render the issue one for the jury); Riccio v. New Haven Bd. of Educ., 467 F.Supp.2d 219, 227-28 (D.Conn.2006)(finding daily verbal and some physical harassment undermined educational experience despite plaintiffs ability to maintain her good grades).
B.
The dissent implies that Dorrance’s harassment could not have interfered with or denied Jennings the full educational opportunity of playing on the UNC women’s soccer team because she attempted to improve her play and was dismayed at being cut from the team. See post at 722-23. In essence, the dissent concludes that because Jennings did her best to avoid Dorrance and his abuse, but still made the most of her time on the team and as a student at UNC, she has forfeited her cause of action. This implication turns Title IX on its head. Cf. Gabrielle M., 315 F.3d at 829 (Rovner, J., concurring in part *707 and concurring in the judgment) (“Neither [the plaintiff] nor future victims of school-place harassment should be penalized simply because they seem resilient.”); Hayut, 352 F.3d at 749 (“[W]hat students put up with, without objection or protest, does not mark the bounds of permissible classroom conduct.”); Henson v. Dundee, 682 F.2d 897, 902 (11th Cir.1982) (“[A] requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.”).
The evidence reflects that Jennings’s attempts to make the most of her team experience did not involve increasing her interaction with Dorrance, but rather with her teammates. For example, in the Spring of 1998, prior to being cut from the team, Jennings hosted a team party at her home and participated in hazing events. J.A. 1365-66. Jennings described her relationship with Dorrance during that time period as not “friendly” or “cozy”: “It was just he was a coach and I was a player, and I did my thing. It wasn’t that ‘Hey, how are you doing,’.... I would get a nod; that is about it.” J.A. 1374. Indeed, Jennings characterized herself as “continuing to pull away from” Dorrance during that time period. J.A. 1374. Thus, while Jennings was attempting to improve her play, her interactions with Dorrance grew more limited and her increased participation in the team took the form of increased socializing with her teammates.
A rational jury could view Jennings as having been denied the full opportunity to achieve her potential as a member of the UNC women’s soccer team, despite her “growing desire to remain with the team.” Post at 723. For example, a jury could view Dorrance to have, in effect, conditioned the receipt of his coaching and advice on acceptance of his sexual banter, a practice which denied Jennings equal access to the benefits of team membership. Cf. Wills 184 F.3d at 30 (noting that it is an open question whether the denial of informal tutoring from a professor is an educational benefit that could form the basis of a Title IX suit).
The dissent ignores the special context of Title IX. Unlike an employee-plaintiff in a Title VII action, if Jennings wished to remain a student at UNC and a member of a varsity soccer team, she had to remain a member of Dorrance’s soccer team. Jennings was, of course, free to transfer, and had she done so as a result of Dorrance’s harassment, she would have been even further deprived of the educational opportunities of UNC. See, e.g., Hayut, 352 F.3d at 750 (viewing student’s withdrawal from a university because of sexual harassment as depriving the student of educational opportunities of university). In sum, a rational jury could find that Jennings, who had played competitive soccer since the age of six, including stints on boys teams, was deprived of the educational advantage of UNC’s soccer program, despite her attempts to improve and her disappointment when she was cut from the team, because of Dorrance’s harassment.
IV.
This is a difficult case, but I ultimately believe that Jennings has presented enough evidence for her Title IX claims to move forward. Drawing inferences in Jennings’s favor, a jury could conclude that the pervasive, hostile environment, resulting from Dorrance’s conduct, amounted to sexual harassment and effectively deprived her of the educational benefits of being a student-athlete at the University. For the reasons stated above, the district court’s grant of summary judgment should be reversed. Accordingly, I concur in the majority’s opinion.
Judge MOTZ has requested that she is shown as joining this opinion.

 I agree with the majority that we may consider, comments: (1) made in Jennings’s presence; (2) made outside her presence, but consistent with her account; and (3) made before her tenure on the team, but discussed in her presence. Cf. Schwapp v. Town of Avon, 118 F.3d 106, 110-12 (2d Cir.1997) ("[incidents ... occurring before [plaintiff's] tenure may be of limited probative value, but cannot be ignored on summary judgment.”); Rodgers v. Western-Southem Life Ins. Co., 12 F.3d 668, 674 (7th Cir.1993) (stating that in reviewing hostile environment claim courts may consider “the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction to its environs”).